**Adolph LYONS, Plaintiff-Appellant,**

**v.**

**CITY OF LOS ANGELES, Doe Crupi, Doe Hills, Doe Sandoval and Doe Lloyd, Defendants-Appellees.**

No. 77–2591.

United States Court of Appeals, Ninth Circuit.

March 28, 1980.

Michael R. Mitchell, Los Angeles, Cal., for plaintiff-appellant.

Daniel U. Smith, Deputy City Atty., Los Angeles, Cal., for defendants-appellees.

Before TUTTLE,* TRASK and ANDERSON, Circuit Judges.

TUTTLE, Circuit Judge:

Appellant Adolph Lyons filed a seven-count civil rights complaint against the City of Los Angeles (City) and four of its police officers, alleging serious police misconduct. The district court granted partial judgment on the pleadings in favor of the City with respect to those counts seeking injunctive and declaratory relief (counts five, six and seven.) Because we find that the district court misperceived the nature of the "case or controversy" and standing requirements in dismissing part of this case, we reverse the court's order as to counts five and six. We affirm the court's order as to count seven.

## I.

The appellant alleges that four Los Angeles city police officers stopped his car because one of its taillights had burned out. He further alleges that without any provocation or reason to fear for their safety, the police officers applied strangleholds around his neck until he was rendered unconscious. Appellant asserts that the police department actively encourages the use of these holds even in non-life-threatening situations, and that on several occasions such police strangleholds have resulted in severe permanent injuries or even death.

The appellant alleges numerous constitutional violations by the police under color of state law. He maintains that the strangleholds violated the first amendment (prior restraint on speech), the fourth amendment (unreasonable seizure of the person), the eighth amendment (cruel and unusual punishment), and the fourteenth amendment (due process). The first four counts of the complaint seek money damages, invoking 42 U.S.C. §§ 1983, 1985, and 1986, and the theory that the City is vicariously liable for the actions of its employees. Counts 5 and 6 seek injunctive and declaratory relief, respectively, to restrain the City from authorizing the use of the stranglehold controls except where the victim reasonably appears to be threatening the immediate use of deadly force.[1]

---

* Honorable Elbert P. Tuttle, Senior United States Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. We note that the appellant in no way asks for a complete prohibition on the use of the stranglehold. He only seeks to restrain its use to situations where it is constitutional. In what circumstances the use of the strangleholds is constitutional is, of course, a judgment for the district court to make. Our opinion deals only

Count seven requests a declaratory judgment concerning the constitutionality of a local ordinance creating an alleged conflict of interest within the office of the city attorney. Section 20.26 of the Los Angeles City Administrative Code assigns to the city attorney the duty to prosecute misdemeanors committed within the city limits.[2] The city attorney, however, is also the official responsible for defending the city against civil liability for the acts of its employees. The appellant therefore argues that when a suspected misdemeanant is a city employee acting in the course of his employment, the city attorney cannot prosecute without violating his ethical duties of his client. Thus, section 20.26 effectively prevents the prosecution of city employees. Therefore, the argument continues, section 20.26 violates the equal protection clause by providing less protection for victims of misdemeanors committed by city employees, than for victims of misdemeanors committed by others. In count seven appellant alleges that the city attorney has neither investigated nor prosecuted the police officers responsible for the assault. He seeks a declaratory judgment that section 20.26 is unconstitutional.

The City moved for partial judgment on the pleadings with respect to counts five, six, and seven, and with respect to those portions of the vicarious liability count (count two) that related to appellant's first and eighth amendment claims. This appeal is from the order granting that motion.[3] Appellant apparently does not contest that

part of the order relating to count two of the complaint. Thus, the only claims at issue here are those contained in counts five, six, and seven, against the City.

## II.

Count seven of the plaintiff's complaint requests a declaration that section 20.26 of the Los Angeles City Administrative Code, which delegates to the city attorney the authority to prosecute misdemeanors committed within city limits, violates equal protection by effectively barring prosecution of city employees for misdemeanors.

The City argues that Lyons lacked standing to assert that the failure of the city attorney to prosecute his assailants violated his constitutional rights. The City also argues, among other things, that the City is immune from suit regarding the performance of discretionary prosecutorial duties, and the relief sought constitutes an unwarranted interference with state criminal proceedings.

■ We need not reach these contentions, however, because we find the appellant's argument moot. The city attorney has now announced an official policy of referring to the district attorney those criminal cases in which the alleged misdemeanant is a city employee, and in which there is a reasonable basis for a civil suit against the city. Therefore, this part of the case is no longer justiciable. *Cf. Hall v. Beals*, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969).[4] Therefore, we affirm the dis-

with the issue of whether or not Lyons has standing to assert his claims, and whether those claims meet the case or controversy requirements.

2. The state enabling law authorizes such prosecution if the district attorney consents. Cal. Gov.Code § 41803.5.

3. Pursuant to 28 U.S.C. § 1291, the Courts of Appeals have jurisdiction over appeals from "final decisions" of the federal district courts. Partial disposition of a multiparty or multiclaim action does not constitute a final decision, absent "an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R. Civ.P. 54(b). *See also Manhart v. City of Los*

*Angeles*, 553 F.2d 581 (9th Cir. 1978), rev'd on other grounds, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); *Huckeby v. Frozen Food Express*, 555 F.2d 542 (5th Cir. 1977); *Lane v. Graves*, 518 F.2d 965 (8th Cir. 1975). In this case, however, the district court has made the required determination and direction.

4. Unlike our reasoning in Part III of the opinion, we reject the contention that this case is not moot because "there is a possibility of a recurrence which would be within the terms of a proper device." *See* Bator, Mishkin, Shapiro and Wechsler, Hart & Wechsler's *The Federal Courts and the Federal System*, 110 (1973). We find as to this count, that given the change in policy, there is not a strong possibility of a

trict court as to count seven, intimating no view as to the merits of the appellant's contentions.

### III.

However, we reach a different result as to counts five and six pertaining to the use of the stranglehold controls. Count five of the complaint seeks preliminary and permanent injunctions restraining the City from authorizing use of the stranglehold controls other than in life-threatening situations. Count six seeks a declaration that the use of such controls in non-life-threatening situations violates several provisions of the Constitution.

The district court did not issue findings of fact or conclusions of law on these issues. We therefore assume that its judgment rested essentially upon the rationales set forth in the defendant's motion in support of partial summary judgment on the pleadings and its briefs in this Court.

The appellee relies chiefly on the reasoning of *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) and *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) for the proposition that Lyons has not shown the possibility of "real and immediate future injury." It is true, as the appellee states, that *O'Shea* says that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." 414 U.S. at 495–96, 94 S.Ct. at 676. This is an argument that the plaintiff's case or controversy is no longer active, but is moot or not ripe.[5]

It seems the court below concluded, most likely on the basis of *O'Shea* and *Riz-*

zo, that there was no standing because there was insufficient showing that the police were likely to do this to the plaintiff again. While this factor was discussed in both *Rizzo* and *O'Shea*, reliance on both those cases to support this contention is misplaced. *O'Shea* involved a suit alleging racial discrimination against a local judge and magistrate. To be affected by the alleged practices of these officers the court said that the plaintiffs would have to "proceed to violate an unchallenged law and *if* . . . charged, held to answer, and tried . . . before petitioners . . . [and then] subjected to the discriminatory practices . . . ." 414 U.S. at 497, 94 S.Ct. at 676. In *Rizzo*, a broad-based suit that sought primarily to protect minorities from alleged police abuses, the Court found the plaintiff's claims even more speculative, since they were based "upon what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures." 423 U.S. at 372, 96 S.Ct. at 605.

But in this case, the threat of future injury to not only Lyons, but to every citizen in the area is much more immediate. To be subject to these strangleholds, a citizen need only be stopped for a minor traffic violation while driving an automobile, as shown by the alleged facts in this case. The use of these strangleholds is accepted police practice, even in non life-threatening situations. It is not farfetched to suggest that especially in a city like Los Angeles, where many motorists drive long distances daily, the chances of being stopped by a policeman for an alleged motor vehicle violation are fairly good. Certainly the odds

---

recurrence of the behavior of which the appellant complains.

**5.** *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction, § 3531 at 231–32 (1975): "*O'Shea v. Littleton* blended standing with both ripeness and mootness concerns. . . . As will be seen, much of the law of ripeness and mootness can be viewed as simply a convenient way of expressing particular aspects of standing concerns." And at 89 Supp. (1979) (concerning *Rizzo*): "Recourse to

Article III justiciability doctrine in this setting has strong connections with established mootness doctrines." *See also Warth v. Seldin*, 422 U.S. 490, 499, n.10, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975): "The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention—and of mootness—whether the occasion for judicial intervention persists."

of having that sort of encounter are much greater than the odds of having the sort of encounters described in *O'Shea* or in *Rizzo*, and therefore meet the constitutional requirements of "case" or "controversy." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). For that reason alone, we could hold that Lyons has standing to seek injunctive relief, even given the *O'Shea* and *Rizzo* standards that there be a showing that this plaintiff would be stopped again and subjected to the practice.

But this case is distinguishable from both *O'Shea* and *Rizzo* case on broader and more significant grounds. The plaintiffs in *O'Shea* and *Rizzo* sought massive structural relief. In *O'Shea* the court's opinion characterized the relief sought as an "ongoing federal audit of state criminal proceedings." 414 U.S. at 500, 94 S.Ct. at 678. Because of the broad charges and the sweeping relief sought in both cases, the plaintiffs were asking the federal courts, in effect, to supervise the conduct of state officials and institutions over a long period of time. It was this role and this perceived intrusion into what were considered state matters which were at the heart of the court's reluctance to find that the "case" or "controversy" requirements had been met. In this sense, the Court's opinion in *O'Shea* and *Rizzo* represented the evolution of the court's concerns about "our federalism" first noted in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).[6]

However in this case, the plaintiff seeks no such structural relief. He seeks merely to enjoin the use of an established police practice which he maintains violates a number of his constitutional freedoms and the freedoms of his fellow citizens. Unlike the situations in *O'Shea* and *Rizzo*, he does not seek to supervise the functioning of the police department. In *Rizzo*, the Supreme Court distinguished and implicitly approved a Fourth Circuit case in which an injunction against the police department was granted, *Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966), on the grounds that in that case the Baltimore Police were "executing an 'evil practice that has long and notoriously persisted in the Police Department.'" 423 U.S. at 362, 373–74 n.8, 96 S.Ct. at 605 n.8. In *Lankford*, the Fourth Circuit was persuaded that an injunction should issue even though the complained-of practices had ceased. 364 F.2d at 202–04. The Supreme Court also distinguished *Rizzo* from *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) and *Allee v. Medrano*, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), two cases which permitted suits under 42 U.S.C. § 1983 against law enforcement authorities, on the grounds that the latter two cases involved a "persistent pattern" of police misconduct rather than a statistical pattern which showed a certain type of behavior. The charge in this case involves a sanctioned police practice and policy which is clearly closer to the "pattern" of police behavior in *Hague* and *Allee* than *Rizzo*.[7] And even though the Supreme Court in *Rizzo* analyzed this "practice and pattern" issue in terms of the showing needed to establish liability under § 1983, it relates directly to the Court's discussion of the standing or ripeness issue because both re-

---

6. *See generally*, Fiss, Dombrowski, 86 Yale LJ 1103 (1977), especially at 1153: "For the new majority committed to the 'Our Federalism' of *Younger* and to limitation of federal intervention in state court proceedings, the administrative injunction sought in *O'Shea v. Littleton* was a monstrosity: . . . ." *See also*, Tribe, Constitutional Law 156, (1978), "*O'Shea* and *Rizzo* no doubt reflect a concern on the part of the Supreme Court that some limits be placed on the power of federal district courts to put into effect broad structural injunctions of the sort which have become more commonplace in recent years."

7. "The infrequent invocation of the *Hague* remedy is at least partially explained by the fact that deliberately ordered violations of constitutional rights have not been the primary problem. Most frequently, unconstitutional searches, arrests, or other abuses of police authority cannot be traced as in *Hague* to direct instructions from high police officials." Note, The Federal Injunction as a Remedy for Unconstitutional Police Conduct, 78 Yale L.J. 143, 147 (1968). This case fits neatly into the *Hague* set of facts since the stranglehold was sanctioned police practice. Therefore, the issuance of an injunction is particularly appropriate.

flect the Court's preoccupation with the problems of granting massive structural relief.[8]

It is clear that Lyons once had a live and active claim meeting all the Article III requirements even under *O'Shea* and *Rizzo*, if only for a period that lasted but a few seconds. That period could be described as the time between the moment he was stopped and the moment the stranglehold was applied, or even the split second between the moment the officer moved to grab him and the moment the stranglehold was applied. If under *O'Shea* and *Rizzo* Lyons no longer has a claim for injunctive relief, it is because that claim has now become moot and that controversy no longer exists.

But there are notable exceptions to the mootness rule which make Lyons' claim deserving of consideration in court.

There is a long-standing rule of equity that a case does not become moot as to the specific petitioner in a case, even if the complained-of conduct has ceased, "if there is a possibility of a recurrence which would be within the terms of a proper decree." *See* Bator, Mishkin, Shapiro and Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 110 (1973). As stated in *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), an antitrust case in which the defendant had voluntarily ceased the allegedly illegal conduct:

> Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.*, does not make the case moot. . . . A controversy may remain to be settled in such circumstances . . . . The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. . . . For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right . . . . The courts have rightfully refused to grant defendants such a powerful weapon against public law enforcement. [Citations omitted.]

*Id.* at 632, 73 S.Ct. at 897. *Cf. United States v. Trans-Missouri Freight Assn.*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); *NLRB v. Raytheon Co.*, 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970); *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29 (1944).[9] Under this standard, Lyons' claim is not moot and can be heard since there is a strong possibility of recurrence of this police tactic.[10]

---

**8.** *See Warth v. Seldin*, 422 U.S. 490, 520 (1975) (Brennan, J., dissenting) for a similar analysis that a decision on standing was related to a judgment on the merits; *see also*, Wright, Miller & Cooper, § 3531 at 89 Supp.

*See also* Note, Rizzo v. Goode: Federal Remedies for Police Misconduct, 62 Va.L.Rev. 1259, 1265 (1976): "The Court's conclusion that the plaintiffs had no case or controversy with Philadelphia police officials reflected the Court's view of the merits: high police officials do not 'cause' citizens 'to be subjected' to patterns of misconduct merely by acquiescing in them."

**9.** As stated in *Walling*, a case under the Fair Labor Standards Act in which an employer argued the case was moot because the complained-of practice had been discontinued:

> We hold that the case is not moot under these circumstances. Despite respondent's voluntary cessation of the challenged conduct, a controversy between the parties over the legality of the split-day plan still remains. Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power. . . . Respondent has consistently urged the validity of the split-day plan and would presumably be free to resume the use of this illegal plan were not some effective restraint made. . . . (Citations omitted).

*Id.* at 43, 65 S.Ct. at 14–15. In this case there is even a stronger possibility of recurrence since the police have not offered to discontinue the practice.

**10.** As to the question of whether the possibility of recurrence must affect that individual plaintiff, *see* Wright, Miller & Cooper, § 3533 at 285: "If a plaintiff who once had standing persists in wishing to litigate a question that was once ripe, willingness to litigate may well rest either upon a substantial fear of future effect or upon a strong desire to vindicate the public interest. Either motive should ensure adequate presentation of the issues."

Lyons' claim is also one that is "capable of repetition, yet evading review" and therefore should be heard. *Southern Pacific Terminal Company v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). If Lyons is denied standing to pursue his claim, it is doubtful that anyone will be able to challenge the use of the stranglehold because of the circumstances under which they occur. The Supreme Court has invoked this "capable of repetition, yet evading review" doctrine to review claims, even if the future recurring controversy has been shown to have but a small chance of affecting the original plaintiff. Thus, candidates have been allowed to attack eligibility statutes under this doctrine after their case was mooted, even though there was little or no showing that these individuals might run for office again. *Moore v. Ogilvie*, 394 U.S. 814, 815–16, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969). In *Roe v. Wade*, 410 U.S. 113, 124–25, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973), there was little showing that the particular women challenging the statute would again become pregnant and desire an abortion. *Cf., SEC v. Sloan*, 436 U.S. 103, 109–10, 98 S.Ct. 1702, 1707, 56 L.Ed.2d 148 (1978). If the plaintiffs in those cases met the Article III requirements because the type of claims they had brought were "capable of repetition, yet evading review," Lyons' claim should be allowed to proceed also.[11]

■ The Supreme Court treated the plaintiffs in *O'Shea* and *Rizzo* differently, however. What distinguishes *O'Shea* and *Rizzo* from other cases is that both entailed requests for structural injunctions involving federal supervision of state institutions. It is our reading of *O'Shea* and *Rizzo* that the Court applied stricter Article III standards of standing and mootness because of the type of relief the plaintiffs sought. In other words, to trigger a massive federal structural decree involving a state institution, the high Article III standards of *O'Shea* and *Rizzo* must be met because of the Supreme Court's "federalism" concerns. But for a preventive decree like this one, the more lenient Article III standards of standing or mootness in cases like *W.T. Grant* or *Moore* apply.[12]

11. Some might read *De Funis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), the equal protection challenge to the University of Washington's "quota" system in admissions as authority for the proposition that the *W. T. Grant* or the "capable of repetition, yet evading review" doctrines do not apply to Lyons' case. In *De Funis*, the Court refused to apply the *Grant* line of decisions because "mootness in the present case depends not at all upon a 'voluntary cessation' of the admissions practices that were the subject of this litigation . . . [but upon] the simple fact that De Funis is now in the final quarter . . . of study . . ." *Id.* at 318, 94 S.Ct. at 1707. The Court said the case was not "capable of repetition, yet evading review" because there was "no reason to suppose that a subsequent case attacking those procedures will not come with relative speed to this Court." *Id.* at 319, 94 S.Ct. at 1707.

But this case is clearly distinguishable from *De Funis* as to both doctrines. The Supreme Court was certainly correct that the issues De Funis raised would come before the Court again with relative speed since five years later, it decided *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In contrast, if Lyons is not allowed to raise his claim here because his case is moot, there is certainly no reason to think that anyone else will be able to attack these procedures "with relative speed," since the mootness standards apparently established in the lower court will keep nearly all plaintiffs similarly situated out of court.

As to the relevance of the *Grant* line of cases, the Court in *De Funis* found *Grant* inapposite because the University of Washington had subsequently admitted De Funis and was permitting him "to complete the term for which he is now enrolled." *Id.* at 318, 94 S.Ct. at 1707. The case therefore was moot because by the time the Supreme Court heard the case, De Funis had received the relief he requested when he filed the suit. In contrast, in this case Lyons has not received the relief he sought when he filed suit. Given that distinguishing fact, we hold the *Grant* line of cases applicable and this case not moot since Lyons has a much stronger continuing "adverse legal interest" than De Funis had at the time the Supreme Court considered his case. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

12. In his casebook, *Injunctions* (1972), Professor Fiss identifies three types of injunctions. "A preventive injunction," he writes "tries to stop a discrete event or act. The other two types of injunctions—regulatory and structural—are differentiated from preventive injunc-

This view is bolstered by other factors. Mr. Justice Story described "the unique office of the injunction as preventive justice: the injunction is an instrument designed to prevent a wrong from occurring in the future." [13] Story was speaking, of course, of the traditional preventive injunction; the notion of the structural injunction had not yet appeared in our jurisprudence.[14]

To read *Rizzo* and *O'Shea* in the manner suggested by the appellees, and apparently adopted by the district court is to take notions of federalism applicable peculiarly to structural decrees and use them to negate the injunction's function as an instrument of preventive justice. For if the standing requirements of *Rizzo* and *O'Shea* are invoked in cases such as this one, it is difficult to see how anyone can ever challenge police or similar administrative practices, since usually no one can know definitely if he is going to be subject to police scrutiny in the future. We cannot believe the Supreme Court in *Rizzo* and *O'Shea* meant to make it nearly impossible to challenge unconstitutional police practices. To do so would be to grant defendants the "powerful weapon against public law enforcement" which the Court rejected in *W.T. Grant* and other cases. That can only encourage a disrespect for both the law and the police who enforce that law. For as Mr. Justice Brandeis once wrote:

> In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

*Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis J., dissenting).

The strangleholds challenged here may be illegal or they may not be. But as long as we refuse to allow anyone to attack their constitutionality here, we tell the citizen that there is no guardian of his constitutional rights. That is a principle that has no foundation either in the Constitution or in our beliefs about what a government ought to be. For that reason, we REVERSE and REMAND to the district court as to counts five and six for proceedings not inconsistent with this opinion.

---

tions in that they establish a long, continuing relationship between the parties and the individual. . . . [In the structural decree], [t]he Court attempts to use the injunction as a device for altering or reorganizing some institutional arrangement. . . ." *Id.* at 1.

In *The Civil Rights Injunction* (1978), Fiss further characterizes the structural injunction as: "entailing a relationship of long duration between the judge and the social institution. . . ."

These considerations—the consumption of resources and even more the role transformation—render plausible the possibility of a right without a remedy—that the court will decline to issue a structural injunction even though that is by far the best remedy. . . ." *Id.* at 108–109.

Professor Fiss' comments on the utility of the structural injunction notwithstanding, what is clear in this case is that Lyons sought no structural relief. Therefore, these concerns about the role transformation of the courts, whether legitimate or not, which clearly played a role in the *O'Shea* and *Rizzo* cases are irrelevant here. See note 6.

As to the Supreme Court's attitude towards structural relief, perhaps Francis Bacon summed it up best four centuries ago in his *Of Innovations:* "And he that will not apply New Remedies, must expect New Evils: for Time is the greatest Innovatour . . . ." cited in *Note,* Developments in the Law—Injunctions, 78 Harv.L.Rev. 994 (1965).

**13.** *See* Fiss, *The Civil Rights Injunction,* 9.

**14.** In *The Civil Rights Injunction,* Professor Fiss traces the development of the structural injunction, tying its development to the civil rights era.