658 F.2d 1272
 PORTLAND POLICE ASSOCIATION and Stan Peters, individually
and as President of the Portland Police
Association, Plaintiffs-Appellants,
v.
The CITY OF PORTLAND, By and Through the BUREAU OF POLICE;
and B. R. Baker, individually and in his capacity
as Chief of the Bureau of Police,
Defendants-Appellees.
 No. 79-4292.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 8, 1981.
Decided Sept. 23, 1981.
Rehearing and Rehearing En Banc Denied Dec. 2, 1981.
 
 David J. Edstrom, Portland, Or., for plaintiffs-appellants.
 Richard A. Braman, Portland, Or., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before CHOY, KENNEDY and REINHARDT, Circuit Judges.
 KENNEDY, Circuit Judge:
 
 
 1
 The Portland Police Association (PPA) and its President brought suit in district court for an injunction against enforcement of an order by the Chief of the Bureau of Police of the City of Portland. In essence, the Chief's order states that after a "major incident," such as the discharge of a firearm or an on-duty automobile collision, the Portland police officer involved must "completely document his/her actions" in official reports before going off duty. It further states that "(o)fficers involved in such incidents do not, at the time of creating such official reports, have the right to consult with an attorney...." The order provides, however, for provision of counsel if the officer's superiors or the police legal advisor believe that the officer may be exposed to criminal liability or employment sanctions. Peters and the PPA challenge the portion of the order which limits the right to consult counsel before writing the report, and they seek relief under 42 U.S.C. § 1983. They allege that the order violates their privilege against self-incrimination, their freedom of association, their sixth amendment right to counsel, and their due process and equal protection rights under the fourteenth amendment. After consolidating the hearing for the preliminary injunction with the trial on the merits, the court below denied the injunctive and declaratory relief requested by the plaintiffs. We hold that the complaint does not present a justiciable controversy and remand the case so that it may be dismissed for lack of jurisdiction.
 
 
 2
 Before a case is justiciable in federal court, it must be alleged that the plaintiff is threatened by injury that is "both 'real and immediate,' (and) not 'conjectural' or 'hypothetical.' " O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), quoting Golden v. Zwickler, 394 U.S. 103, 109-10, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969). See also Rizzo v. Goode, 423 U.S. 362, 372-73, 96 S.Ct. 598, 604-05, 46 L.Ed.2d 561 (1976); City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231, 238-39 (9th Cir. 1980). Without such immediacy and certainty of injury the dispute is not ripe; it has not "matured sufficiently to warrant judicial intervention." Warth v. Seldin, 422 U.S. 490, 499 n.10, 95 S.Ct. 2197, 2205 n.10, 45 L.Ed.2d 343 (1975).
 
 
 3
 O'Shea presented an example of an impermissibly speculative claim. There, nineteen plaintiffs brought a class action challenging allegedly unconstitutional bail setting and post-trial sentencing practices in Cairo, Illinois. None of the plaintiffs, however, alleged any specific injury with regard to these practices. 414 U.S. at 495, 94 S.Ct. at 676. All that counsel for the plaintiffs could allege was that several unspecified plaintiffs had been subject to the illegal practices. Id. In order to allege the necessary injury, the court stated that it was necessary to assume a series of contingencies: "if (plaintiffs) proceed to violate an unchallenged law and if they are charged, held to answer and tried in any proceedings, they will be subjected to discriminatory practices." Id. at 497, 94 S.Ct. at 676 (emphasis in original). This string of contingencies was determined to be too speculative and conjectural for resolution by a federal court.[1] Id. See also Rizzo v. Goode, supra; Golden v. Zwickler, supra; City of South Lake Tahoe, supra; Stewart v. M. M. & P. Pension Plan, 608 F.2d 776, 784-85 (9th Cir. 1979).
 
 
 4
 Here, the allegations of the appellants are even more speculative. Central to any case in which Portland police officers' rights are even arguably violated is the following series of contingencies: the officer must be in a "major incident"; he or she must be at least partly culpable for its occurrence; he or she must request counsel; that request must be denied or counsel must not otherwise be supplied; and, finally, disciplinary or criminal proceedings must be instigated for either failure to complete reports or because of the utterance of incriminating statements during the report process. The series of contingencies is not only long, but the appellants have failed to demonstrate that each stage necessarily follows its predecessor. In their pretrial statement, for example, both parties agreed not to contest that no Portland police officer had ever been denied counsel when he or she requested one. In O'Shea, at least, there was some allegation of past illegal activity upon which to base a claim of a threat of real and immediate injury. 414 U.S. at 495-96, 94 S.Ct. at 676. Furthermore, the order itself says that counsel may be provided if the officer's command or the independent police advisor believes the officer's statements may be incriminating. Thus, not only is the series of contingencies longer than the one in O'Shea, but the appellants can neither offer any history of alleged deprivations, nor assert with assurance that counsel will not be provided in the future. As such, their claim is abstract at best.[2] It is not appropriate for judicial determination at this time.[3]
 
 
 5
 The judgment is vacated and the case is remanded so that the action may be dismissed for want of a justiciable controversy.
 
 REINHARDT, Circuit Judge, dissenting:
 
 6
 I dissent. The Portland Police Association (PPA) represents all of the members of the Bureau of Police of the rank of policeman, detective, criminalist, and sergeant (collectively referred to in this dissenting opinion as "police officers"). In August 1978 the Chief of Police issued a memorandum-order prohibiting police officers from consulting with private counsel prior to completing and submitting an official report regarding any "major incident" in which they are involved.[1] Major incidents include the discharge of a firearm at a criminal suspect, other use of deadly force, and involvement in a serious on-duty motor vehicle accident. There is an exception for instances in which a commanding officer or the Bureau's legal advisor concludes, on the basis of the information provided to him, that the officer should be allowed to consult private counsel.[2] It is not entirely clear whether this memorandum-order reflects a continuation of a preexisting policy, as defendants contend, or whether the memorandum-order constitutes a change in policy in some respects, as the memorandum-order itself suggests and as the Chief of Police apparently admitted.[3] It is clear, however, why the Chief of Police issued the memorandum-order.
 
 
 7
 In July 1978, in an article contained in its regular newspaper, the PPA announced to its members that it had hired an attorney to give advice to its members. The article stressed the attorney's familiarity with firearms incidents and the Bureau's operations. The attorney had just completed five years service with the Bureau as a legal advisor. The article notified the Portland police officers that if they were involved in a firearms incident they could call the attorney at his home or office number, that he would be on 24-hour call and would "immediately" provide whatever legal advice they needed in preparing reports or making statements. The Chief testified that upon reading the PPA's newspaper article he issued the memorandum-order which gives rise to the litigation before us.
 
 
 8
 The PPA contends that the memorandum-order violates a number of its members' constitutional rights, including their first amendment right to freedom of association.[4] There is no question that individual officers who consult an attorney in violation of the Chief's memorandum-order are subject to discipline, including discharge. The Chief so testified. There is also no question that the Portland police officers desire to exercise their constitutional right to consult an attorney prior to filing a report (if they in fact have such a right), since they hired an attorney to provide that very service.[5]
 
 
 9
 The majority finds a lack of ripeness and dismisses the litigation for want of a justiciable controversy. I disagree. While the constitutional question is a serious and substantial one, I do not express any view as to its ultimate resolution. That is a matter that will have to be decided when the majority's test of ripeness is met. That the officer who chooses to be a guinea pig to be the first to exercise what Portland's police officers believe to be their constitutional right to consult an attorney may suffer a lawful discharge if another panel of this court subsequently decides he guessed wrong about the meaning of the constitution is, to say the least, an unfortunate consequence of the majority's decision.
 
 
 10
 The majority bases its conclusion as to ripeness primarily on O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). O'Shea involved an effort by a number of civil rights activists to have the federal courts impose restrictions on a local judge and magistrate who allegedly discriminated against those seeking racial equality. The Court was unwilling to assume that any of the individuals who filed the lawsuit would in the future violate any valid law, be charged before the particular magistrate or judge, and then be treated in a discriminatory manner by one of them. The Court said that it was "important" to its decision that there was no allegation that any statute was unconstitutional on its face or as applied. Id. at 496, 94 S.Ct. at 676. The Court thought the O'Shea lawsuit was speculative.[6] In the case before us, the facts are precisely the opposite. The suit is brought not by a few individuals who might or might not ever be affected by alleged discriminatory treatment by a particular individual, but by all of the members of a police department who are directly affected by a formal memorandum-order issued by their Chief for the specific purpose of limiting their rights. They contend the order is unconstitutional on its face and as construed by the issuing authority.
 
 
 11
 In the case before us, all of the police officers, acting collectively through their association, hired an attorney to be available 24 hours a day to provide them with advice at the time they deemed that advice necessary. The Police Chief reacted swiftly by issuing a formal order prohibiting them from obtaining that advice. We can presume that the police officers retained an attorney to provide advice because they desire to take advantage of his services. While it is true that some individual officers may forego their constitutional right (if it exists) to seek such advice, it is far from speculative to recognize that others are certain to utilize the services of the attorney they "hired". It takes little knowledge of the realities of life in a metropolitan police department to realize that the Chief of Police issued his order swiftly for good reason. While, as the Supreme Court said, the 19 O'Shea plaintiffs might never be arrested for violating a valid law, it is inevitable that some of the members of the Portland Bureau of Police will be involved in serious incidents, i. e., they will either use firearms, or deadly force, or will be involved in automobile accidents.[7] It is equally clear that some of these officers will seek to consult the attorney already retained by them for that very purpose. That we cannot now determine specifically which of the officers before us will do so is of no consequence. In my opinion, there is nothing speculative, therefore, about the fact that the memorandum-order gives rise to the necessary threat of future injury.
 
 
 12
 Another case relied on heavily by the majority is Rizzo v. Good, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In that case, the Court said it "entertain(ed) serious doubts" as to the standing question. 423 U.S. at 371, 96 S.Ct. at 604. In Rizzo, plaintiffs sought to have the federal courts impose supervisory procedures over the conduct of the Philadelphia Police Department. The district court found that "only a small percentage" of policemen violated citizens rights. The Court characterized the suit as "a heated dispute between individual citizens and certain policemen," and said the real issue was not what the "named petitioners (the Mayor, the Chief of Police, and other top officials) might do to them (respondents) in the future ... but upon what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures." 423 U.S. at 371-372, 96 S.Ct. at 604. The Court said there was no official authorization or approval of the isolated wrongful acts; no official police department policy was involved. The Court also said that the district court had found that unless the relief sought were granted, "the incidents were likely to continue to occur, not with respect to (the complaining individuals)," but with respect to other minority citizens. 423 U.S. at 371, 96 S.Ct. at 604.
 
 
 13
 In the case before us, the suit is aimed at the very party that has committed the alleged wrongful act. It is brought by those who are directly affected. There is no question that the named defendants intended and intend to deprive plaintiffs of the rights they assert. There is no question that an official policy of the Bureau of Police is the source of the controversy. There is nothing speculative about the very real disagreement over constitutional rights that exists between the Portland police officers and the Chief of Police. The Chief issued a narrow, specific, direct order designed expressly to prohibit the officers from doing precisely what they not only seek to do but what they actually have done by hiring an attorney.
 
 
 14
 The distinctions between O'Shea and Rizzo on the one hand and the type of complaint filed by the Portland police officers on the other are clearly set forth in Lyons v. City of Los Angeles, 615 F.2d 1243 (9th Cir.), cert. denied, 449 U.S. 934, 101 S.Ct. 333, 66 L.Ed.2d 158 (1980). In Lyons, the court reversed a district court's finding that no case or controversy existed in a suit in which an individual citizen challenged a Los Angeles Police Department policy authorizing the use of "stranglehold controls other than in life threatening situations." This court noted that, in contrast to O'Shea and Rizzo, the challenge involved "an accepted police practice" and a "sanctioned police practice and policy." 615 F.2d at 1246, 1247. The court said:
 
 
 15
 The use of these strangleholds is accepted police practice, even in non life-threatening situations. It is not farfetched to suggest that especially in a city like Los Angeles, where many motorists drive long distances daily, the chances of being stopped by a policeman for an alleged motor vehicle violation are fairly good. Certainly the odds of having that sort of encounter are much greater than the odds of having the sort of encounters described in O'Shea or in Rizzo, and therefore meet the constitutional requirements of "case" or "controversy." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691 (703), 7 L.Ed.2d 663 (1962); Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923).
 
 
 16
 615 F.2d at 1246-47. We should note, incidentally, that it was not contended in Lyons that the "accepted police practice" was to apply the stranglehold to every motorist stopped for an alleged motor vehicle violation.
 
 
 17
 In Lyons, this court properly distinguished both O'Shea and Rizzo "on broader and more significant grounds." We looked beyond the specifics of the plaintiffs' complaints to determine the true thrust of the O'Shea and Rizzo decisions. We concluded that the basis for those decisions was the Supreme Court's rejection of plaintiffs' efforts to impose continuing federal supervision over the day-to-day operations of a local court system and local police department. Lyons said:
 
 
 18
 Because of the broad charges and the sweeping relief sought in both cases, the plaintiffs were asking the federal courts, in effect, to supervise the conduct of state officials and institutions over a long period of time. It was this role and this perceived intrusion into what were considered state matters which were at the heart of the court's reluctance to find that the "case" or "controversy" requirements had been met.
 
 
 19
 615 F.2d at 1247.
 
 
 20
 The majority opinion suggests that the Portland police officers here seek to impose federal controls over "the inner workings and control of a local police department." This suggestion, as Lyons makes plain, stems from a misunderstanding of O'Shea and Rizzo. It is also a mischaracterization of the relief sought by Portland's police officers. These officers will undoubtedly be surprised to discover that they are attempting to disturb the delicate balance between our state and federal systems simply by seeking to invoke their constitutional rights. Federal courts still retain jurisdiction to invalidate a police department rule which violates the constitutional rights of citizens, even if they be police officers. In Lyons, Judge Tuttle sought, in a learned discussion, to explain the difference between the type of relief sought here invalidation of an unconstitutional order and the vague but massive type of supervisory relief sought in O'Shea and Rizzo. Judge Tuttle clearly laid out the distinction between a preventative injunction designed to stop a discrete event or act and a structural injunction "entailing a relationship of long duration between the judge and the social institution." While paying lip service to Lyons, the majority opinion ignores every distinction it attempts to draw and every lesson it seeks to teach.[8]
 
 
 21
 Since the Portland police officers have taken concrete action to implement their desire to consult legal counsel when preparing their reports regarding serious incidents, the Chief of Police has ordered them not to exercise their "rights," and the violation of the Chief's memorandum-order would subject Portland police officers to disciplinary action, the effect of the memorandum-order is to place Portland police officers in the position of exercising their constitutional rights (if they exist) only at the risk of jeopardizing their employment. The effect of the majority opinion is to hold that officers must actually take that risk in order to present a justiciable case or controversy. That ruling represents neither common sense nor the law, as I understand it. To require police officers to risk their jobs in order to invoke their constitutional rights is to place them in fear of exercising such rights. When individuals are put in that position the requisite irreparable injury for obtaining an injunction has been shown. As the Supreme Court said in Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) " '(t) he traditional prerequisite to obtaining an injunction' " is established when individuals are "placed in fear of exercising their constitutionally protected rights to free expression, assembly, and association." 416 U.S. at 814-815, 94 S.Ct. at 2200.[9]
 
 
 22
 Rather than remanding for dismissal for want of a justiciable controversy, I would reach the merits of the dispute, as the district court did, and decide the serious constitutional questions presented in this case, although not necessarily in the same manner as the district court did.
 
 
 
 [1]
 This inquiry is distinct from the analysis, on the merits, of whether the plaintiffs have demonstrated a case for equitable relief. See O'Shea v. Littleton, 414 U.S. 488, 499-504, 94 S.Ct. 669, 677-680, 38 L.Ed.2d 674 (1974)
 
 
 [2]
 Judge Reinhardt's dissent makes much of the fact that all the officers who might be affected by the proposed order are here before the court. A like circumstance did not disturb the result in United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 86-91, 67 S.Ct. 556, 562-565, 91 L.Ed. 754 (1947). Various federal employees there challenged the Hatch Act which restricted their political activity. The Court dismissed the claims of those employees who had not alleged specific past acts of political participation. The Court said:
 The power of the courts, and ultimately of this Court, to pass upon the constitutionality of acts arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference. A hypothetical threat is not enough. We can only speculate as to the kind of political activity the appellants desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication. It would not accord with judicial responsibility to adjudge, in a matter involving constitutionality, between the freedom of the individual and the requirements of public order except when definite rights appear upon the one side and definite prejudicial interferences upon the other.
 Id. at 89-90, 67 S.Ct. at 564 (footnote omitted).
 Here, the PPA can show no prior incidents where an officer was not allowed his own counsel nor can they definitively demonstrate that such counsel would be denied in the future. Without such a showing, they have failed to make out the real and substantial controversy required by Article III. See Western Mining Council v. Watt, 643 F.2d 618, 626-27 (9th Cir. 1981).
 The dissent's citation to Lyons v. City of Los Angeles does not aid its cause. As made clear in Lyons II, the allegations of injuries were specific, non-remote, and capable of precise judicial evaluation. Lyons v. City of Los Angeles, 656 F.2d 417, 418 (9th Cir. 1981). That record provided the "definite prejudicial interferences" required by United Pub. Workers of Am. The case before us does not.
 
 
 [3]
 This case is thus readily distinguishable from Lyons v. City of Los Angeles, 615 F.2d 1243 (9th Cir. 1980). There, a citizen sought to enjoin the Los Angeles Police Department from employing strangleholds against automobile drivers stopped for minor traffic violations. In the face of an attack alleging that such future acts were too uncertain, the court responded that the case involved all possible Los Angeles drivers, and that the challenged acts were alleged to be "accepted police practice." 615 F.2d at 1246. With these facts, the court found that the "odds" of a constitutional violation were "much greater" than in O'Shea. Id. at 1247. By contrast, the appellants can point to no case where counsel was denied, nor can they unequivocally state that counsel will never be provided
 The court in Lyons further distinguished O'Shea and Rizzo on the ground that Lyons did not seek the federal supervision of the Los Angeles Police Department; he merely sought to enjoin an "established practice" which routinely violated citizens' constitutional rights. Id. Here, the appellants desire the federal courts to disturb the inner workings and structure of a local police department. The federalism concerns here are parallel to those expressed in O'Shea and Rizzo, and thus we follow that latter line of cases.
 
 
 [1]
 Although the testimony of the Chief of Police was both contradictory and confusing, it is clear that such is the effect of the order. The pertinent part of the memorandum-order provides:
 At the immediate conclusion of a major incident in which an officer has taken official action (i. e., officer acting in official capacity has discharged firearm at a criminal suspect, officer has been involved in a serious on-duty vehicle accident, etc.), such officer is required to completely document his/her actions in that incident, as a part of the investigation of the criminal conduct of the suspect. Officers involved in such incidents do not at the time of creating such official reports, have the right to consult with an attorney (whether privately retained or retained by the P.P.A.). In such incidents, the Bureau's legal advisor may be asked to respond, to facilitate report preparation in an effort to minimize potential liability to the officer, the Bureau and the city. In such a situation, the legal advisor represents both the officer and the Bureau.
 
 
 [2]
 While I do not express a view as to the proper outcome of the serious constitutional questions here presented, I doubt that this exception is of any particular moment to the "ripeness" issue. It is mentioned only in the interest of providing a full description of the memorandum-order. The constitutional problem is most squarely presented when a police officer wishes to consult a private attorney in order to obtain advice as to his obligation to prepare and submit the report, the consequences of his failure to do so, and the uses to which such a report may be put. He may also want to know the extent of his obligation to talk with his commanding officer or the Bureau's legal advisor, and whether he is entitled to have a representative of the Association, a fellow police officer, present. The answer to these questions may be obvious to some persons, but not necessarily to all police officers. The exception, certainly, is of no assistance to the officer seeking to obtain this information before he meets with his commanding officer or the Bureau's legal advisor
 
 
 [3]
 The last paragraph of the memorandum-order reads:
 This procedure, which has been consistently utilized in the past in less serious incidents, will provide the officer, the Bureau, and the city with the maximum protection consistent with the acceptance of our law enforcement responsibilities in such major incidents. Please ensure that all officers of your command are apprised regarding this process.
 The following colloquy occurred on cross-examination of the Chief of Police:
 Q. Let me read you one sentence from there on Page 4. It's entitled, "Private Legal Counsel with Regard to the Firearms Policy", and it's under the subdivision,
 "When an officer shoots a suspect."
 It says,
 "Labor Agreement Section 53, the right to private legal counsel at the onset of the departmental investigation."
 Do you still contend that you didn't change things with this 21st memorandum?
 A. Well, it would seem that it does conflict in that area, yes.
 MR. EDSTROM: I have no further questions.
 
 
 [4]
 See United Mineworkers of America v. Illinois State Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (freedom of association protects union's employment of salaried attorney to handle the members individual worker's compensation claims); United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971), and Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964) (freedom of association protects union's referral of its members to specific attorneys); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (freedom of association protects association's advice to its members that their rights had been violated and referral of its members to specific attorneys). I mention these cases not for the purpose of suggesting an answer to the constitutional question but only to note some of the contexts in which questions regarding the relationship between freedom of association and the right to obtain counsel or legal advice have been resolved
 
 
 [5]
 As noted, the record leaves considerable doubt as to whether Portland police officers had been deprived of their alleged constitutional rights prior to the issuance of the memorandum-order. The fact that no police officer previously claimed a violation of such rights is, therefore, of no significance. Moreover, the fact that police officers may have complied with an unlawful policy in the past rather than risk discharge in no way supports the conclusion that they were not being deprived of constitutional rights
 
 
 [6]
 The Court said:
 Under these circumstances, where respondents do not claim any constitutional right to engage in conduct proscribed by therefore presumably permissible state laws, or indicate that it is otherwise their intention to so conduct themselves, the threat of injury from the alleged course of conduct they attack is simply too remote to satisfy the case-or-controversy requirement and permit adjudication by a federal court.
 414 U.S. at 498, 94 S.Ct. at 677.
 
 
 [7]
 In O'Shea, the Court said, "We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners." 414 U.S. at 497, 94 S.Ct. at 677. In the case before us, petitioners seek the right to consult counsel when they are involved in a serious incident. They are not asking for the right to consult counsel when they violate the law. We, of course, cannot presume that everyone who seeks to consult an attorney has committed a crime. The distinction, for purposes of ripeness, between the claim of the Portland police officers and the O'Shea plaintiffs is clear. While it may be fair to "assume" that the O'Shea plaintiffs would obey the law one cannot assume that none of the officers of a major police department will ever be involved in a serious incident
 
 
 [8]
 In Lyons II, another panel of this court, consisting of Judges Goodwin, Hug, and Farris, reaffirmed Judge Tuttle's analysis. Lyons v. City of Los Angeles, L.A. Daily J., Aug. 25, 1981, at 2569, col. 1, 656 F.2d 417 at 418 (9th Cir. 1981). In Lyons II, we affirmed a preliminary injunction enjoining the use of "carotid artery or bar arm strangle holds" under certain circumstances. We characterized such injunctive relief as "relatively innocuous interference by the judiciary with police practice." In so doing, this court again distinguished Rizzo, characterizing that case as follows: "Federal courts may not order sweeping structural relief requiring federal court supervision of state police procedures absent 'extraordinary circumstances.' " Id. (emphasis added)
 
 
 [9]
 We need not look only to cases involving police conduct to determine that ripeness is not a bar to determining the existence or non-existence of the constitutional rights involved. The ripeness concept is far from an inflexible barrier to the resolution of serious issues. The Supreme Court has in a number of cases examined the question of ripeness from a practical standpoint. For example, the Court has said that it does not matter that it may be some time before a specific violation occurs in an individual case. The Court said in (Blanchette v. Conn. General Ins. Corps.) Regional Rail Reorganization Act Cases, 419 U.S. 102, 143 (95 S.Ct. 335, 358, 42 L.Ed.2d 320) (1974):
 Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect. Pennsylvania v. West Virginia, 262 U.S. 553, 592-593 (43 S.Ct. 658, 663-664, 67 L.Ed. 1117) (1923); Pierce v. Society of Sisters, 268 U.S. 510, 536 (45 S.Ct. 571, 574, 69 L.Ed. 1070) (1925); Carter v. Carter Coal Co., 298 U.S. 238, 287 (56 S.Ct. 855, 862, 80 L.Ed. 1160) (1936). "One does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending that is enough." Pennsylvania v. West Virginia, supra, at 593 (43 S.Ct. at 663).
 In a footnote the Court distinguished criminal cases where, it said, the rule is stricter. But see Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In Duke Power Company v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Court decided that it was not necessary to await a nuclear explosion to decide the constitutionality of the statute limiting liability in the case of such incidents. While the Court found that plaintiffs alleged certain minor present environmental injuries resulting from the construction of nuclear power plants, it added that even aside from that fact the question deserved immediate judicial resolution. The Court said that no one would benefit from delay, and that it was in the interests of all affected parties to proceed to decide the issue. In Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Court decided the constitutionality of a state statute prohibiting the teaching of evolution although it noted that there was no reason to believe the state would ever enforce it. It said that there was no record of any prosecution under the statute and that "(i)t is possible that the statute is presently more of a curiosity than a vital fact of life ...." 393 U.S. at 102, 89 S.Ct. at 269. In Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973), the Court held that doctors who sought to challenge a state's anti-abortion law presented a justiciable controversy even though none of them had been prosecuted or threatened with prosecution. In Doe, the Court said:
 The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.
 Id. (emphasis added). Doe cited Epperson with approval and distinguished Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), on the ground that it involved a "moribund" rather than a recent statute.