**SHELL PETROLEUM, N.V., Plaintiff,**

v.

**Mary Ann GRAVES, Kenneth Cory, Ernest J. Dronenburg, Jr., individually and as members of, and Gerald H. Goldberg, individually and as Executive Officer of, The Franchise Tax Board, State of California, Defendants.**

No. C–81–4302–MHP.

United States District Court,
N.D. California.

Reissued Aug. 1, 1983.

Steward R. Bross, Jr., John R. Hupper, Paul M. Dodyk, Richard W. Clary, Cravath, Swaine & Moore, New York City, John B. Lowry, Richard Murray, Donn P. Pickett, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for plaintiff.

Patricia Streloff, Deputy Atty. Gen., San Francisco, Cal., for defendants.

Lloyd Cutler, William Lake, Robert Pozin, Wilmer, Cutler & Pickering, Washington, D.C., amicus curiae for Government of Kingdom of Netherlands.

Alexander Calhoun, D. Richard Urdan, David Gross, Graham & James, San Francisco, Cal., amicus curiae for Govt. of Japan.

## MEMORANDUM DECISION AND ORDER

PATEL, District Judge.

## I. INTRODUCTION

Plaintiff Shell Petroleum, N.V. (hereinafter "SPNV") is, by its own account, an incorporated Netherlands holding company with its principal place of business in The Hague, The Netherlands. It is not qualified to do business in the United States; and it neither does business nor has any permanent establishment in the United States.

SPNV owns approximately 69% of the outstanding shares of the common stock of Shell Oil Company (hereinafter "Shell Oil"), which is incorporated in Delaware and headquartered in Houston, Texas. The remaining common stock of Shell Oil is held by a large number of shareholders; the stock is listed for trading on the New York Stock Exchange and other stock exchanges in the United States and Canada. Shell Oil does business in California and throughout the United States, as well as in several foreign countries.

SPNV also owns 100% of the shares of Scallop Holding Incorporated, a Delaware corporation with its principal place of business in the State of New York. Scallop Holding Incorporated in turn holds 100% of the stock of Scallop Nuclear, Inc. (hereinafter "Scallop Nuclear"), which is also a Delaware corporation with offices in New York. Scallop Nuclear, like Shell Oil, does business in California. Neither Scallop Nuclear nor Shell Oil are parties to this action.

Sixty percent of the equity shareholdings of plaintiff SPNV are held by Royal Dutch Petroleum Company (hereinafter "Royal Dutch"), which is incorporated in The Netherlands, and the other 40% is held by the Shell Transport and Trading Company, Public Limited Company (hereinafter "Shell Transport"), which is incorporated in England. Royal Dutch and Shell Transport also hold, directly or indirectly, entire or majority interests in over 900 companies located in more than 100 countries around the world. These companies are principally engaged in producing and marketing chemicals and non-ferrous metals, in mining and marketing coal, and in the exploration, production, refining, and marketing of oil and gas.

SPNV has filed this action for declaratory and injunctive relief against the Execu-

tive Officer and members of the Franchise Tax Board (hereinafter "the Board"). SPNV alleges that the Board has assessed or plans to assess Shell Oil and Scallop Nuclear for additional corporate income tax payments it maintains are owing for tax years 1967–76, under the provisions of the California Bank and Corporation Tax Law, Cal.Rev. & Tax.Code §§ 23001 et seq.

Sections 25101 and 25120–25140 of that Code provide a formulary method for apportioning income derived from a taxpayer's business activities both within and without California. Simply stated, the statutory formula requires that three fractions be calculated: (1) the ratio of the value of all real and tangible personal property of the taxpayer in California to its worldwide real and tangible personal property; (2) the ratio of the California payroll of the taxpayer to its worldwide payroll; and (3) the ratio of the value of the California sales of the taxpayer to the value of its worldwide sales. These three fractions are then, in effect, averaged, and the resulting fraction is then multiplied by the taxpayer's total income to find the portion of that income attributable to California for state corporate franchise tax purposes. One obvious purpose of this formulary apportionment method is to frustrate the shifting of income to the taxpayer's subsidiaries or unincorporated branches in nations or states with more hospitable tax laws, by means of fraudulent intracorporate or intercorporate transactions which, at least on paper, reduce the incomes of the California subsidiaries or branches while inflating those of out-of-state subsidiaries or branches.

SPNV alleges that the Board has made or will make a determination that Shell Oil and Scallop Nuclear, the California taxpayers here, are in fact part of a single unitary business enterprise consisting of all the many worldwide companies that are more than 50% owned, directly or indirectly, by Royal Dutch or Shell Transport, irrespective of where these many companies do business. On the basis of that determination, SPNV alleges, the Board has combined or plans to combine the income of all of these companies, arriving at the fraction of that aggregate income which it considers to be attributable to the California business activities of Shell Oil and Scallop Nuclear by means of the statutory formula. SPNV alleges that the Board's application of the formula to the worldwide income of the Royal Dutch/Shell Transport companies produces a gross disproportion between the income so attributed to California activities and the income actually earned by Shell Oil and Scallop Nuclear.

SPNV contends that the California apportionment method, both facially and as applied by the Board in this case, is repugnant to the commerce clause, article I, section 8, clause 3; the due process clause, amendment XIV, section 1; and the treaty clause, article II, section 2, clause 2, of the Constitution of the United States. It also contends that the method applied by the Board violates the Treaty of Friendship, Commerce and Navigation, March 27, 1956, United States-Netherlands, 8 U.S.T. 2043, T.I.A.S. No. 3942 (hereinafter "the Treaty of 1956"), and the Convention Between the United States of America and the Kingdom of the Netherlands with Respect to Taxes on Income and Certain Other Taxes, April 29, 1948, 62 Stat. 1757, T.I.A.S. No. 1855, as amended by a Supplementary Convention, December 30, 1965, 17 U.S.T. 896, T.I.A.S. No. 6051 (hereinafter "the Double Taxation Convention"). In addition, SPNV contends that the method applied by the Board violates "general principles of international law."

SPNV also complains of allegedly burdensome and unlawful demands for information made by the Board upon both Shell Oil and Scallop Nuclear. SPNV alleges that the Board has demanded of the taxpayers information, much of which is not in their possession, concerning the history, structure, business, revenues, and income of the more than 900 companies controlled by Royal Dutch or Shell Transport, along with an account of past crude oil transactions between Royal Dutch/Shell Transport companies. For its failure to produce information demanded by the Board, SPNV alleges, Shell Oil has been notified of a proposed

penalty assessment by the Board. SPNV, contending that these demands for information are tantamount to an unlawful assertion of jurisdiction over SPNV, seeks an injunction preventing the defendants from pressing them.

SPNV has moved for summary judgment, and the defendants have moved to dismiss the action. The court grants the motion to dismiss because SPNV does not have standing to raise its claims, and because the controversy is not ripe for decision.

## II. STANDING

SPNV does not, according to its complaint, conduct business operations within the United States, and it is not a California taxpayer. The Board is not alleged to have assessed or exacted taxes or demanded information directly from SPNV. Rather, taxpayers Shell Oil and Scallop Nuclear, which do transact business in California, are the entities of whom information has allegedly been directly demanded, and against whom the proposed assessments will allegedly be made.

 Shell Oil and Scallop Nuclear have not joined in this action; nor could they have done so, as the Tax Injunction Act, 28 U.S.C. § 1341 et seq., withholds from the district courts jurisdiction to entertain actions for injunctive or declaratory relief from the assessment, levy, or collection of any state tax if the plaintiff has a "plain, speedy and efficient remedy" in state court. Where a United States subsidiary corporation is aggrieved by an allegedly unlawful income tax assessment by the California Franchise Tax Board, which assessment is based on the application of the formula apportionment method to the Board's determination that the subsidiary, its foreign parent, and other subsidiaries of the parent are engaged in a unitary business, the taxpayer subsidiary has a plain, speedy, and efficient remedy in state court and is therefore precluded from seeking declaratory[1] or injunctive relief in federal district court. *Capitol Industries-EMI, Inc. v. Bennett,* 681 F.2d 1107 (9th Cir.1982), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 655 (1982).[2]

While the Tax Injunction Act is not directly at issue in this action, its salutary purposes should be kept in mind. The "principal motivating force behind the Act" was a congressional desire "to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Rosewell v. LaSalle National Bank,* 450 U.S. 503, 522, 101 S.Ct. 1221, 1234, 67 L.Ed.2d 464 (1981). *See also California v. Grace Brethren Church,* 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982). The Act was designed to effectuate this policy notwithstanding the fact that the states may require that the taxpayer subject itself to the state's exactions as a precondition of a state court challenge to the lawfulness of those exactions. *See California v. Grace Brethren Church,* 102 S.Ct. at 2512–13; *Rosewell v. LaSalle National Bank,* 450 U.S. at 523–24, 101 S.Ct. at 1234–35. Section 1341 reflects "the fundamental principle of comity between federal courts and state governments that is essential to 'Our Federalism', particularly in the area of state taxation"—an independent principle that was relied on by the federal courts in refusing to grant equitable relief from state tax laws both before and after the enactment of the statute. *Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. 100, 103, 102 S.Ct. 177, 179, 70 L.Ed.2d 271 (1981).[3]

1. In *California v. Grace Brethren Church,* 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982), the Supreme Court held that the Tax Injunction Act prohibits district courts from granting declaratory relief as well as injunctive relief.

2. *Capitol Industries-EMI v. Bennett,* like the case *sub judice,* involved a constitutional challenge to unitary treatment, and as in the instant case the plaintiff sought relief from the Board's demands upon the taxpayer subsidiary for business records of the foreign parent and of the parent's other subsidiaries. But it did not, apparently, involve a challenge based on a treaty or on international law.

3. Thus, " 'even where the Tax Injunction Act would not bar federal-court interference in state tax administration, principles of federal equity may nevertheless counsel the withhold-

Another important purpose of the Act was to equalize the remedies available to taxpayer corporations that were citizens of the state imposing the tax, on the one hand, and foreign taxpayer corporations, on the other. Congress feared that absent the Act, a foreign corporation, through diversity, could, at that time, obtain federal-court relief prohibiting the collection of certain state taxes, while the citizen corporation would be required to pay first and then litigate in the state courts. *Fulton Market Cold Storage Co. v. Cullerton,* 582 F.2d 1071, 1074–75 (7th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979), *disapproved on other grounds, Fair Assessment in Real Estate Association v. McNary, supra; Robinson Protective Alarm Co. v. City of Philadelphia,* 581 F.2d 371, 375 (3d Cir.1978); *Tramel v. Schrader,* 505 F.2d 1310, 1316 (5th Cir.1975). *See also Rosewell v. LaSalle National Bank,* 450 U.S. at 522–23 n. 29, 101 S.Ct. at 1233–34 n. 29.

■ In the instant case, the foreign shareholder seeks to circumvent the Tax Injunction Act by a bold and simple technique: bringing its own action.[4] While Shell Oil and Scallop Nuclear have plain, speedy, and efficient administrative and state court remedies in these circumstances, *see Capitol Industries-EMI, Inc. v. Bennett,* 681 F.2d at 1113–18, SPNV does not, because it is not the taxpayer, *id.* at 1118. It is therefore not barred by the Tax Injunction Act. *Id.* at 1119.

But although the *Capitol Industries* court remanded the cases before it, holding that the foreign parent, unlike its taxpayer subsidiary, was not barred by the Act, it expressed serious reservations concerning the parent's standing to challenge the proposed assessment against its subsidiary. *Id.* at 1119 n. 31. The standing issue, it noted, was not before the court on that appeal. It is before this court in the instant case.

[3] It is clear in this circuit, as it is in others, that the shareholder of a corporation—even a sole shareholder—does not, in general, have standing to redress an injury to the corporation. *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 439–40 (9th Cir.1979) (creditor and sole shareholder had no standing to assert either federal or state law claims); *Von Brimer v. Whirlpool Corp.,* 536 F.2d 838, 846 (9th Cir.1976) (majority shareholder may not assert state law claims despite economic injury to him); *Erlich v. Glasner,* 418 F.2d 226 (9th Cir.1969) (shareholder who, with his wife, owned all the stock of injured corporation, could not maintain an action under 42 U.S.C. § 1983 to redress the injury). *Accord, Gregory v. Mitchell,* 634 F.2d 199, 202 (5th Cir.1981); *Smith v. Martin,* 542 F.2d 688, 690 (6th Cir.1976), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 388 (1977); *Vincel v. White Motor Corp.,* 521 F.2d 1113 (2d Cir. 1975); *Vanderboom v. Sexton,* 460 F.2d 362, 364 (8th Cir.1972); *McDaniel v. Painter,* 418 F.2d 545, 547 (10th Cir.1969).[5]

■ In the case at bar, the plaintiff must be in a position to assert much more than mere economic injury occasioned by its ownership of a corporation whose rights have been violated. *Von Brimer v. Whirlpool,* 536 F.2d at 846. It must allege that it, rather than the taxpayer subsidiary, has been injured, individually and directly, by independent wrongdoing infringing rights belonging severally to it as a shareholder. *Id.; Erlich v. Glasner,* 418 F.2d at 228; *Buschmann v. Professional Men's Associa-*

---

ing of relief.' " *Fair Assessment in Real Estate Association, Inc. v. McNary,* 454 U.S. at 107 and n. 4, 102 S.Ct. at 181 and n. 4 (quoting *Rosewell v. LaSalle National Bank,* 450 U.S. 503, 525–26 n. 33, 101 S.Ct. 1221, 1235–36 n. 33, 67 L.Ed.2d 464 (1981)). As the Supreme Court reaffirmed in the *Fair Assessment* and *Rosewell* cases, the Act is not a mandatory withdrawal from federal courts of their traditional power to decline jurisdiction, where equitable relief is sought, in the exercise of their discretion.

4. SPNV, according to the pleadings, is the majority shareholder of Shell Oil, and the sole shareholder of Scallop Nuclear's only shareholder.

5. Of course, under proper circumstances a shareholder may bring a derivative action *on behalf of* the corporation. *Erlich v. Glasner,* 418 F.2d 226, 228 (9th Cir.1969). But that is not this case.

*tion,* 405 F.2d 659 (7th Cir.1969). A statute or other provision may specifically vest rights and create a right of action in the shareholders as distinct from the corporation, *see Harmsen v. Smith,* 542 F.2d 496, 499–500 (9th Cir.1976) (section 93 of the National Bank Act); but absent this, injury to the corporation is not cognizable as injury to the shareholders, for purposes of the standing requirements.

It does not appear that the constitutional provisions alleged to have been violated by the imposition of this method of taxation or by the Board's alleged informational demands specifically vest rights in, or create any right of action in favor of, the shareholders as shareholders, apart from those of the corporation. *See Erlich v. Glasner* (action under 42 U.S.C. § 1983 grounded on alleged deprivation of due process). Nor does SPNV refer the court to any authority suggesting that what it describes as "general principles of international law" or "customary international law" specifically vest such rights in shareholders as such.

SPNV does, however, suggest that it lies "within the zone of interests protected by" the Treaty, and that the Double Taxation Convention vests rights in SPNV as well as in its United States subsidiaries.[6] It further contends that the Treaty and the Double Taxation Convention incorporate the commerce clause and the due process clause of the Constitution into their national treatment guarantees. Only if the Treaty or the Convention specifically create rights of action by a Netherlands shareholder of a U.S. corporation does SPNV have standing to complain of threatened injury to Shell Oil and Scallop Nuclear.

The portions of the Treaty which SPNV contends give rise to its claims are Article I(1), Article VI(3), and Article XI(1), (3), and (4).[7] The question is whether these

---

**6.** As SPNV contends, its allegations satisfy the "injury in fact" requirement for standing under article III of the federal Constitution. *See Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). Injury in fact was undoubtedly adequately alleged in most of the cases holding that majority or sole shareholders did not have standing to redress injuries to the corporation. But even where the requirements of article III are satisfied, a plaintiff may still lack standing under "prudential" standing principles. *Id.* at 99–100, 99 S.Ct. at 1607–08. Among these principles are that a plaintiff must be asserting " 'his own legal rights and interests, and cannot rest his claim to relief on the legal rights and or interests of third parties,' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), and "that the plaintiff's complaint [must] fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question,' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The requirement that a shareholder establish injury to rights specifically vested in it individually, distinct from those of the corporation, is undoubtedly a prudential rather than a constitutional one. It might or might not be a particular instance of the more general prudential standing principles quoted above. But in any event, the requirement must be satisfied.

**7.** The text of these provisions is as follows.
*Article I(1)*
 1. Each Party shall at all times accord fair and equitable treatment to the nationals and companies of the other Party, and to their property, enterprises and other interests.
*Article VI(3)*
 3. Neither Party shall take unreasonable or discriminatory measures that would impair the rights or interests within its territories of nationals and companies of the other Party, whether in their capital, or in their enterprises and the property thereof, or in the skills, arts or technology which they have supplied.
*Article XI(1)*
 1. Nationals of either Party residing within the territories of the other Party, and nationals and companies of either Party engaged in trade or other gainful pursuit or in scientific, educational, religious or philanthropic activities within the territories of the other Party, shall not be subject to the payment of taxes, fees or charges imposed upon or applied to income, capital, transactions, activities or any other object, or to requirements with respect to the levy and collection thereof, within the territories of such other Party, more burdensome than those borne by nationals and companies of such other Party.
*Article XI(3)*
 3. Nationals and companies of either Party shall in no case be subject, within the territories of the other Party, to the payment of

provisions should be understood to vest rights in SPNV. The opinion of the Supreme Court in *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), is instructive.

*Sumitomo Shoji* dealt with the question whether a U.S. corporation that was wholly owned by a Japanese general trading company was a company of Japan within the meaning of the Treaty of Friendship, Commerce and Navigation between Japan and the United States, April 2, 1953, 4 U.S.T. 2063, T.I.A.S. No. 2863, Article VIII(1) of which provides that "companies of either Party shall be permitted to engage, within the territories of the other Party ... specialists of their choice." The Court concluded that locally incorporated subsidiaries of Japanese corporations are not companies of Japan, but rather companies of the United States.[8] In doing so, it relied on language identical to that in the closely similar U.S.–Netherlands Treaty.[9]

In the instant case, the treaty language upon which SPNV relies vests rights, if at all, in "nationals and companies of the [Netherlands]." *See* Article I(1); Article VI(3); Article XI(1), (3) and (4). It is clear that a company of the Netherlands which itself transacts business in the United States falls within the zone of interests sought to be protected by the Treaty; but it is also clear from *Sumitomo Shoji* that a U.S. corporation and its foreign parent are not mere extensions of each other, for Treaty purposes.

To extend the treaty language, by construction, specifically to protect Netherlands shareholders of U.S. corporations would in effect accord to those U.S. companies fortunate enough to have Netherlands companies or nationals among their shareholders rights not accorded to corporations the shareholders of which are all United States citizens. Such a result would be exactly contrary to the conclusion of a unanimous Court in *Sumitomo Shoji* that the purpose of the Friendship, Commerce and Navigation treaties negotiated in the post-World War II period was to assure foreign corporations the right to transact commercial business themselves, or to form locally incorporated subsidiaries, on an

---

taxes, fees or charges imposed upon or applied to income, capital, transactions, activities or any other object, or to requirements with respect to the levy and collection thereof, more burdensome than those borne by nationals, residents and companies of any third country.

*Article XI(4)*

4. In the case of companies and of nonresident nationals of either Party engaged in trade or other gainful pursuit within the territories of the other Party, such other Party shall not impose or apply any tax, fee or charge upon any income, capital or other basis in excess of that reasonably allocable or apportionable to its territories, nor grant deductions and exemptions less than those reasonably allocable or apportionable to its territories. A comparable rule shall apply also in the case of companies organized and operated exclusively for scientific, educational, religious or philanthropic purposes.

**8.** The significance of that issue was that Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.,* would apply to the U.S. subsidiary's employment practices if it was not a company of Japan protected by Article VIII(1) of the Treaty.

**9.** The Treaty of Friendship, Commerce and Navigation, March 27, 1956, United States-

Netherlands, 8 U.S.T. 2043, T.I.A.S. No. 3942, and the Treaty of Friendship, Commerce and Navigation, April 2, 1953, United States-Japan, 4 U.S.T. 2063, T.I.A.S. No. 2863, are two of the many Friendship, Commerce and Navigation treaties entered into by the United States after the Second World War. The two treaties are closely similar in structure, scope, purpose, and language, as the Government of Japan, appearing in this case as amicus curiae, points out. Not only are the portions of the Treaty with Japan relied on by the Supreme Court in *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), substantially identical to their counterparts in the Treaty with the Netherlands (compare Article XXIII(3) of the Japanese Treaty with Article XXIII(3) of the Netherlands Treaty, and compare Articles VII(1), VII(4), VIII(1), and XVI(2) of the Japanese Treaty with the like-numbered provisions in the Netherlands Treaty), but portions of the Netherlands Treaty on which SPNV relies are closely similar to their counterparts in the Japanese Treaty (compare Article VI(3) of the Netherlands Treaty with Article V(1) of the Japanese Treaty, and compare Articles XI(1), XI(3), and XI(4) of the Netherlands Treaty with the like-numbered provisions in the Japanese Treaty).

equal basis with U.S. concerns, and *not* to accord to the domestic subsidiaries of foreign parents rights not shared by other U.S. corporations. *Id.* at 188, 102 S.Ct. at 2381. Thus, the court will not strain to read into the Treaty an implied right of action by Netherlands shareholders of U.S. companies, as shareholders, when such a construction would, for example, permit SPNV to maintain an action to enjoin state tax assessments against Shell Oil, although U.S. oil companies not partially owned by a Netherlands shareholder would not have such a right of action. In view of the importance the Supreme Court has recently placed on the Tax Injunction Act, and in view of the fact that an action by shareholders to enjoin the collection of a state tax assessed against a corporation, such a construction of the Treaty would be particularly inappropriate in a tax case. It would contravene the purposes of the Act, *see* p. 62, *supra,* by permitting such injunctions at all, and particularly by permitting them at the instance of U.S. corporations with Netherlands shareholders while denying them to U.S. corporations the shareholders of which do not include Netherlands nationals or companies.

Therefore, the court concludes that the Treaty in question here does not create a right of action in favor of Netherlands shareholders as shareholders to redress an injury to the corporation; and SPNV's standing cannot rest on the provisions of this Treaty.

Nor can SPNV's standing rest on the provisions of the Double Taxation Convention. The provision of the Convention on which SPNV relies, Article XXV(4), provides:

(4) A corporation of one of the Contracting States, the capital of which is wholly or partly owned by one or more citizens or corporations of the other Contracting State, shall not be subjected in the former Contracting State to more burdensome taxes than is a corporation of the former Contracting State, the capital of which is wholly owned by the one or more

citizens or corporations of that former Contracting State.

This provision, of course, vests rights, if at all, in the locally incorporated subsidiary of the foreign parent. Nothing is said about creating a right of action by the shareholder as a shareholder. Shell Oil and Scallop Nuclear might assert claims based on this provision, but SPNV may not.

Because neither the Treaty nor the Convention specifically creates a right of action by foreign shareholders, as shareholders, to redress an injury to a U.S. corporation, SPNV lacks standing to maintain its claim.

## III. RIPENESS

Because SPNV has brought this action under 42 U.S.C. § 1983, it is not to be subjected to a requirement that it exhaust its state administrative remedies. *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). But the requirement that a controversy be ripe for adjudication applies to actions brought under § 1983, even though the exhaustion requirement does not. *Portland Police Association v. City of Portland,* 658 F.2d 1272 (9th Cir.1981). Even if SPNV had standing to maintain this action, it would have to be dismissed as unripe.

For a case to be justiciable, a plaintiff must complain of threatened injury that is both "certain" and "immediate." *Portland Police Association v. City of Portland,* 658 F.2d at 1273. Contingent events that might intervene at a future time and moot the controversy have often been held sufficient to require dismissal. *See id.* at 1274; *Excess and Casualty Reinsurance Association v. Insurance Commissioner of California,* 656 F.2d 491, 497 (9th Cir.1981); *Stewart v. M.M. & P. Pension Plan,* 608 F.2d 776 (9th Cir.1979). Moreover, if a state statute or regulation under attack has not yet been fully applied to the plaintiff by an administrative agency, the action would not be ripe "if the issue would be illuminated by the development of a better factual record...." *Pacific Legal Foundation v. State Energy Resources Conservation &*

*Development Commission,* 659 F.2d 903, 915 (9th Cir.1981).

The present posture of this case at the administrative level, according to SPNV, is as follows. SPNV represents that the Board has demanded information of Scallop Nuclear, but that no notice of proposed assessment has yet been issued to Scallop Nuclear. Auditors for the Board have prepared a report proposing that the Board issue such a notice for tax years 1973–76, but the Board has not acted on this proposal. The Board has demanded information of Shell Oil, and issued to Shell Oil notices of proposed assessments for tax years 1967–72. These notices propose assessments of additional taxes, as well as penalties for failure to provide requested information. Shell Oil has formally protested the proposed assessments, and has petitioned the Board pursuant to Cal.Rev. & Tax.Code § 25137, requesting that the "unitary business enterprise" for purposes of Shell Oil's tax be reduced in scope to include only Shell Oil and its subsidiaries. The Board has not acted on its protest or petition. The Board is "preparing to issue" to Shell Oil notices of proposed assessments for tax years 1973–76; and these proposed assessments "may" also include proposed penalties for failure to supply requested information.

Because no notice of a proposed assessment has been submitted to Scallop Nuclear, the controversy is unripe as to that taxpayer. The threatened injury to Scallop Nuclear is not sufficiently certain and immediate to be justiciable. Shell Oil, of course, has allegedly been notified of a proposed assessment. But even as to Shell Oil the statute has not been fully applied. The statutory scheme at issue entitles the taxpayer to a hearing after the filing of its protest, with final action by the Board only after the hearing. An appeal lies to the State Board of Equalization. *See* Cal.Rev. & Tax.Code §§ 25665–25667. It does not appear that Shell Oil or Scallop Nuclear have undergone this process.

During the hearing and appeal process, the Franchise Tax Board and Board of Equalization would presumably be applying the Bank and Corporation Tax Law with the decisions of the Supreme Court in *Asarco Inc. v. Idaho State Tax Commission,* 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982), and *F.W. Woolworth Co. v. Taxation and Revenue Department of New Mexico,* 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982) in mind. These cases, decided while these motions were under submission, reversed state supreme court decisions that had upheld taxation of formula-apportioned income received from foreign subsidiaries of the taxpayers. They clarify the definition of "unitary business" which can pass muster under the due process clause. Just how the Board will apply the Bank and Corporation Tax Law now remains to be seen.

In the course of these proceedings, Shell Oil and Scallop Nuclear might be asked to provide financial information or pay penalties if they resist. Such demands might or might not be unlawful. But in view of both the strong congressional policy and the equity-based views of the Supreme Court that taxpayers ought first to subject themselves to the state's exactions as a precondition to a challenge to the lawfulness of its actions, *California v. Grace Brethren Church,* 102 S.Ct. at 2512–13; *Fair Assessment in Real Estate Association v. McNary,* 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981), this court will not interpose itself merely to prevent the state from demanding information of the taxpayers.

## IV. CONCLUSION

In oral argument, SPNV cited *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), as support for its contention that the international dimension of this case requires that this court reach the merits, even if problems of standing or ripeness might otherwise require it to stop short of a decision on the merits. But *McCulloch* does not stand for the proposition that a district court possesses the inherent power to brush aside doctrines of nonjusticiability merely because the subject matter of an action affects overseas interests. In *McCulloch,* the Court concluded that the district court

had had jurisdiction to enjoin an order of the National Labor Relations Board requiring an election among seamen aboard a Honduran vessel. The Court held that the action fell within what is called the "limited" exhaustion doctrine exception of *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), which had permitted judicial intervention in acts of the Board that are " 'in excess of its delegated powers and contrary to a specific prohibition in the [National Labor Relations] Act.' " *McCulloch,* 372 U.S. at 16, 83 S.Ct. at 675 (quoting *Leedom v. Kyne,* 358 U.S. at 188, 79 S.Ct. at 184). The *McCulloch* Court remarked that an "overriding consideration" in permitting early intervention was the need for prompt judicial resolution of the controversy over the scope of the Board's power, in view of the "international problems for our Government" which the Board's assertion of power was then creating. *Id.* 372 U.S. at 16, 17, 83 S.Ct. at 674, 675.

*McCulloch* is a far cry from this case. The federal forum in *McCulloch* was not confronted with state tax proceedings and the strong policy considerations underlying the Tax Injunction Act. This court will accept *McCulloch* for what it is, a "totally unique situation," *Confederated Independent Unions v. Rockwell-Standard Co.,* 465 F.2d 1137, 1141 n. 11 (3d Cir.1972), which should not be extended beyond its intended scope as a limited exception to requirements of exhaustion of administrative remedies in very rare circumstances.

It is therefore ordered that the action be DISMISSED.