860 F.2d 688
 57 USLW 2289
 ALCAN ALUMINIUM LIMITED, Plaintiff-Appellant,
v.
FRANCHISE TAX BOARD OF the STATE OF CALIFORNIA, et al.,
Defendants-Appellees.
IMPERIAL CHEMICAL INDUSTRIES PLC, Plaintiff-Appellant,
v.
FRANCHISE TAX BOARD OF the STATE OF CALIFORNIA, et al.,
Defendants-Appellees.
 Nos. 87-2239, 87-2295.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 20, 1988.
Decided Oct. 19, 1988*
Rehearing and Rehearing En Banc Denied Jan. 9, 1989.
 
 Lawrence A. Salibra, Alcan Aluminum Corp., Cleveland, Ohio, James M. Carter, ICI Americas Inc., Wilmington, Del., for plaintiff-appellant.
 Patricia Streloff, Office of Atty. Gen. of Cal., San Francisco, Cal., for defendants-appellees.
 Before CUDAHY, FLAUM and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Alcan Aluminium Limited ("Alcan") and Imperial Chemical Industries PLC ("Imperial"), two foreign corporations with American subsidiaries that do business in California, appeal from the district court's dismissal of their constitutional challenge to California's franchise tax. The district court found that the parent companies were injured only in their capacity as shareholders and therefore lacked standing under the well established rule that shareholders must ordinarily demonstrate a direct and independent injury to bring suit. Alcan Aluminium Ltd. v. Franchise Tax Bd., Nos. 84 C 6932, 84 C 8902, mem. op. at 8-10 (N.D.Ill. July 29, 1987) . We find that Alcan and Imperial have incurred injuries that are sufficiently direct and independent of the injuries incurred by their subsidiaries to confer standing. We therefore reverse and remand.
 
 I.
 
 2
 Appellants are foreign corporations with majority interests in domestic companies that conduct business in California. Alcan, a Canadian company, is the sole stockholder of Alcan Aluminum Corporation ("Alcancorp"), an Ohio corporation with operations in California.[1] Imperial, an English holding company, owns over fifty percent of ICI Americas, Inc. ("Americas"), a Delaware corporation that also conducts business in California. California's Franchise Tax Board ("FTB") has assessed, or is in the process of assessing, taxes against both Alcancorp and Americas under California's franchise tax law. See Cal.Gov't Code Secs. 15700-15703 (West 1980 & Supp.1988); Cal.Rev. & Tax Code Sec. 26422 (West 1979).[2]
 
 
 3
 California does not employ conventional geographic or transactional accounting techniques to determine the locally taxable income of California businesses that transact business with affiliated companies outside the state. Instead, California, like a number of other states, employs a unitary tax approach--known in the California Code as the "unitary business/formula apportionment method." FTB first determines the scope of the "unitary business" in which a California corporation participates with affiliated companies and calculates the total earnings of this unitary enterprise. It then computes an allocation fraction for each affected taxpayer. This fraction is an unweighted average of three ratios, the ratios of California payroll to total payroll, California property value to total property value and California sales to total sales. Multiplying a corporation's allocation fraction by the total income of the unitary business in which it participates yields that corporation's taxable income for purposes of the franchise tax. Cal.Rev. & Tax Code Secs. 25128-25137 (West 1979). The Supreme Court has repeatedly rejected claims, in cases involving domestic parent companies, that this three-factor method violates the commerce clause or foreign commerce clause by unfairly overstating the income attributable to operations in the taxing state. See Container Corp. v. Franchise Tax Bd., 463 U.S. 159, 180-84, 103 S.Ct. 2933, 2948-50, 77 L.Ed.2d 545 (1983); Mobil Oil Co. v. Commissioner of Taxes, 445 U.S. 425, 438-39, 100 S.Ct. 1223, 1233, 63 L.Ed.2d 510 (1980); see also Moorman Mfg. Co. v. Bair, 437 U.S. 267, 271-75, 98 S.Ct. 2340, 2343-45, 57 L.Ed.2d 197 (1978). However, the Court has expressly left open the issue that appellants now seek standing to raise: whether application of the unitary tax to domestic subsidiaries of foreign corporations violates foreign commerce clause prohibitions on multiple taxation and the impairment of federal uniformity. See Container Corp., 463 U.S. at 189 n. 26 & 195 n. 32, 103 S.Ct. at 2952-53 n. 26 & 2956 n. 32; see also Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 446-51, 99 S.Ct. 1813, 1820-23, 60 L.Ed.2d 336 (1979) (discussing concerns about multiple taxation and the national uniformity that are peculiar to foreign commerce context). These questions have prompted heated diplomatic protest and threats of retaliation by the domiciliary countries of affected foreign corporations.
 
 
 4
 Alcancorp and Americas, appellants' subsidiaries, are in the midst of contesting the FTB's assessments before California administrative officials and courts. The Tax Injunction Act, 28 U.S.C. Sec. 1341 (1982), prohibits the subsidiaries from obtaining review of the constitutionality of the tax by a federal court until they have exhausted their California appeals.[3] The FTB maintains that the subsidiaries have standing to challenge the franchise tax under the foreign commerce clause in California court and, ultimately, in the United States Supreme Court. Appellants seem to assert, though their position on this point is confused and perhaps inconsistent, that their domestic subsidiaries have no standing to challenge the constitutionality of the franchise tax.[4] In any event, appellants have not given us any convincing reason to doubt that the California courts will entertain Alcancorp's and Americas' foreign commerce clause arguments; so we must proceed on the (perhaps not wholly clear) assumption that the subsidiaries can press these constitutional claims in state court.
 
 
 5
 This case requires us to revisit an issue identified but left unresolved in Alcan Aluminium Ltd. v. Department of Revenue, 724 F.2d 1294 (7th Cir.1984) ("Alcan II "). Alcan II dismissed Alcan's challenge to Oregon's unitary tax as unripe for adjudication until such time as Oregon actually determined that Alcancorp owed franchise taxes. Although we stressed that the dismissal on ripeness grounds implied no position "as to whether appellant will have standing to challenge appellees' actions if appellees do assess Alcancorp as part of a unitary business including appellant," we stated in dictum that if Alcan's factual allegations were taken as true neither Alcan's shareholder status nor the Tax Injunction Act's bar on federal district court suits for declaratory or injunctive relief against state taxes would prevent Alcan from obtaining standing once the dispute became ripe. Id. at 1299. The case before us places the standing issue, an issue which may have important implications for the growing conflict between the United States and nations where parent corporations affected by unitary taxes are domiciled, squarely before this court.
 
 II.
 
 6
 Standing doctrine imposes two types of restrictions on litigants seeking access to federal courts: "constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); see Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99-100, 99 S.Ct. 1601, 1607-08, 60 L.Ed.2d 66 (1979). The FTB does not seriously contest plaintiffs' claims that their interest in challenging the California franchise tax satisfies the case or controversy requirement of article III, section 2. The plaintiffs' ownership interests in their domestic subsidiaries alone, considered apart from the direct harms they incur as participants in foreign commerce (discussed below), clearly give them "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).
 
 
 7
 The dispute here centers on the more elusive, prudential guidelines that the "Court [has] developed, for its own governance in the cases confessedly within its jurisdiction." Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The prudential aspect of the standing inquiry, like the constitutional aspect, derives fundamentally from "concern about the proper--and properly limited--role of the courts in a democratic society." Warth, 422 U.S. at 498, 95 S.Ct. at 2205; see also Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); Peoples Gas, Light & Coke Co. v. United States Postal Serv., 658 F.2d 1182, 1195 (7th Cir.1981). No single formula has been devised for resolving all standing issues in the manifold contexts in which they arise; nothing in the Supreme Court's recent standing decisions belies the observation, now nearly two decades old, that "[g]eneralizations about standing to sue are largely worthless as such." Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).
 
 
 8
 Two large and familiar features of the jumbled standing landscape stand out as useful guideposts for our inquiry in this case. First, it is clear that a plaintiff may only bring suit to vindicate a particularized, personal interest. Generalized grievances do not confer standing, nor do claims to relief resting on "the legal rights or interests of third parties." Warth, 422 U.S. at 499, 95 S.Ct. at 2205; see Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). This principle of judicial self-restraint prevents courts from interfering unnecessarily in "abstract questions of wide public significance" that "other governmental institutions may be more competent to address." Warth, 422 U.S. at 500, 95 S.Ct. at 2206.
 
 
 9
 Second, it is clear that the courts must look to congressional intent when they seek to place appropriate limits on federal judicial power. In the context of administrative action challenged as violative of the governing statutory standard, the Supreme Court has held that "at bottom the reviewability question turns on congressional intent, and all indicators helpful in discerning that intent must be weighed." Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 400, 107 S.Ct. 750, 758, 93 L.Ed.2d 757 (1987); see Block v. Community Nutrition Inst., 467 U.S. 340, 351, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984). A corollary, more pertinent here, holds that standing to bring constitutional challenges to state actions may be precluded by an express or implied congressional prohibition. In California v. Grace Brethren Church, 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982), for example, the Supreme Court held the Tax Injunction Act, which expressly prohibits taxpayer suits for injunctive relief in order to prevent federal courts from interfering with the assessment of state taxes, impliedly prohibits suits for declaratory relief as well. Id. at 407-11, 102 S.Ct. at 2507-09.
 
 
 10
 This case, as we shall see, also implicates judge-made equitable principles under which federal courts have found disputes over state taxes to be nonjusticiable (though typically under the rubric of abstention rather than lack of standing). These principles are distinct from, though consistent with, the comity concerns that Congress sought to protect through the Tax Injunction Act. See Fair Assessment in Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981). The issue is whether, in the circumstances of this case, the equitable principles that favor deference to states on revenue questions outweigh the countervailing obligation of the federal courts to provide a forum for a litigant with no effective state remedy.
 
 III.
 A.
 
 11
 The FTB's arguments against standing purport to rely on these prudential standing principles. First, the FTB argues that the injuries of which Alcan and Imperial complain are indirect injuries incurred by the appellants in their capacity as shareholders of Alcancorp and Americas. The FTB contends that the prudential bar on standing to enforce third parties' rights encompasses a well established prohibition on shareholder suits to redress injuries to their corporations. Longstanding equitable restrictions on shareholder suits, the FTB points out, generally prohibit shareholders from initiating actions to enforce the rights of the corporation unless they can demonstrate that they have taken appropriate steps to persuade the corporate managers to pursue the same action and that the managers refused for reasons other than good faith business judgment. See Twohy v. First Nat'l Bank, 758 F.2d 1185, 1194 (7th Cir.1985); Swanson v. Traer, 249 F.2d 854, 859-61 (7th Cir.1957); see also Fed.R.Civ.P. 23.1 (requirements for bringing shareholder derivative action in federal court). An exception to this rule exists, however. Shareholders with direct, personal interests in a cause of action can bring suit even if the corporation's legal rights and obligations are also implicated. Simcox v. San Juan Shipyard, Inc., 754 F.2d 430, 438 (1st Cir.1985); Buschmann v. Professional Men's Ass'n, 405 F.2d 659, 661-63 (7th Cir.1969); Schaffer v. Universal Rundle Corp., 397 F.2d 893, 896 (5th Cir.1968) (stockholder may bring an individual action "where the wrong itself amounts to a breach of duty owed to the stockholder personally").
 
 
 12
 This case requires us to determine whether Alcan's and Imperial's particular injuries are sufficiently direct and personal to confer standing. The parent companies contend that they are directly injured because they incur significant accounting costs as a result of California's reliance on a unitary tax base, because California effectively taxes the income of overseas affiliates that is already subject to taxes in other jurisdictions and because the tax impairs their subsidiaries' value as instrumentalities of foreign commerce. The FTB counters that each of the harms described by the appellants was incurred indirectly, through the parent corporations' status as shareholders in Alcancorp and Americas.
 
 
 13
 To determine the scope of the exception, we must consider the nature and purposes of the shareholder standing rule. Limitations on shareholder derivative suits in federal courts were originally imposed to curb the use of shareholder suits as a means of invoking diversity jurisdiction when the corporation itself could not. See Hawes v. City of Oakland, 104 U.S. 450, 459-60, 26 L.Ed. 827 (1881); see generally 7C C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 1821 at 10-13 (1986) (describing context of the Hawes holding and its subsequent codification in federal rules). Later, the Supreme Court indicated that the bar on shareholder standing also protects the rights of shareholders who control a majority of voting shares to make binding decisions about the enforcement of corporate rights. See, e.g., Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 463, 23 S.Ct. 157, 160, 47 L.Ed.2d 256 (1903) ("It is not a trifling thing for a stockholder to attempt to coerce the directors of a corporation to an act which their judgment does not approve, or to substitute his judgment for theirs."); see also Swanson, 249 F.2d at 859-60.[5] Courts and commentators have since recognized that the deterrence of "strike suits," shareholder derivative actions brought for the purpose of eliciting lucrative settlements from management rather than to force the corporation to pursue some viable cause of action, is an important objective underlying the shareholder standing requirements. See, e.g., Lewis v. Curtis, 671 F.2d 779, 788 (3d Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); Brink v. Dalesio, 667 F.2d 420, 428 (4th Cir.1981); Note, Trust Beneficiary Standing in Shareholder Derivative Actions, 39 Stan.L.Rev. 267, 273-74 (1986).
 
 
 14
 In a number of more recent cases, federal courts have denied individual standing to shareholders notwithstanding that these shareholders controlled a majority of voting shares and that subject matter jurisdiction did not depend on the individual plaintiff's residence. In Gregory v. Mitchell, 634 F.2d 199 (5th Cir.1981), for example, controlling shareholders in a bank were prevented from suing as individuals under 42 U.S.C. section 1983 for alleged discriminatory treatment by state regulators. Accord Jones v. Niagara Frontier Trans. Auth., 836 F.2d 731, 736 (2d Cir.1987); Erlich v. Glasner, 418 F.2d 226 (9th Cir.1969); see also, e.g., Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 439-40 (9th Cir.1979) (sole shareholder in automobile dealership cannot sue in individual capacity in claims arising under Automobile Franchise Act, antitrust laws or in pendent state claims); Von Brimer v. Whirlpool Corp., 536 F.2d 838, 846 (9th Cir.1976) (majority shareholder barred from suing for interference with corporation's contractual relations; following rule "avoids multitudinous litigation and recognizes the corporate entity"); Smith v. Martin, 542 F.2d 688, 690 (6th Cir.1976), cert. denied, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 388 (1977). But see Leverett v. City of Pinellas Park, 775 F.2d 1536, 1538-39 (11th Cir.1985) (liberal approach to standing in first amendment area makes shareholder standing bar inapplicable where individuals seek to raise corporation's first amendment claims). None of these decisions provides a detailed justification for applying the rule against shareholder standing to situations where shareholder suits do not threaten to circumvent the limits on diversity jurisdiction or to undermine managerial decisionmaking. Von Brimer and Erlich, however, suggest that in this context, the prohibition on shareholder actions rests primarily on considerations of judicial economy and the importance of avoiding a multiplicity of suits. See Von Brimer, 536 F.2d at 846; Erlich, 418 F.2d at 228. See generally 12B W. Fletcher, Cyclopedia of the Law of Private Corporations Secs. 5909-5911 (rev. perm. ed. 1984).
 
 
 15
 This brief overview points up an important difference between limitations on shareholder standing and the general prudential requirements. Though prudential in the sense that they are judge-made restrictions on the availability of the federal courts, traditional limitations on shareholder standing derive from broader origins than do the general prudential restrictions. When courts bar shareholders from bringing suit in order to prevent corporations from circumventing statutory limits on diversity jurisdiction or to prevent minority shareholders from interfering with the operation of the corporation, they are animated by concerns about the limits on judicial power and the appropriateness of a particular plaintiff bringing a particular action--issues at the core of what we have been calling the prudential aspect of the standing question. But when courts bar shareholder suits solely to avoid a multiplicity of suits and to conserve judicial resources, in situations where neither the manipulation of diversity jurisdiction nor the maintenance of majority control is at issue, they are animated by qualitatively different concerns. The focus in this latter class of cases is on " '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,' " Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976) (quoting Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed.2d 200 (1952)). In deciding whether to abstain from a controversy in deference to a parallel state court proceeding--a decision resembling the prudential aspect of a standing determination both in its effect and in its attention to prudential considerations--the Supreme Court has held that the conservation of judicial resources can only in "exceptional circumstances" justify the withholding of federal jurisdiction in spite of "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." Id.; see Moses H. Cone Memorial Hosp. v. Mercury Constr. Co., 460 U.S. 1, 13-19, 103 S.Ct. 927, 935-38, 74 L.Ed.2d 765 (1983).[6] While the courts' housekeeping concerns certainly warrant consideration, we believe that Colorado River and Moses H. Cone place them on a lower footing than concerns about preventing the courts from trenching on the prerogatives of elected officials. Thus, in addressing whether injuries to foreign parents are sufficiently direct to confer standing, we attend to which of the several aims of the shareholder standing "rule" would be served by its invocation.[7]
 
 
 16
 Only a handful of decisions have considered whether foreign parents have standing to contest the constitutionality of unitary taxes assessed on their domestic subsidiaries. In general, they have denied standing; and they have all relied upon a broad formulation of the rule limiting shareholder standing. In Shell Petroleum, N.V. v. Graves, 709 F.2d 593, 595-96 (9th Cir.), cert. denied, 464 U.S. 1012, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983), the Ninth Circuit found that the injury suffered by a parent corporation due to the multiple taxation of foreign income was indirect, entirely derivative of injuries to its California subsidiary.[8] Accord EMI Ltd. v. Bennett, 738 F.2d 994, 996-99 (9th Cir.), cert. denied, 469 U.S. 1073, 105 S.Ct. 567, 83 L.Ed.2d 508 (1984). Similarly, a New York district court has held, and the Second Circuit has affirmed, that Alcan lacked standing to sue the FTB because Alcan had not demonstrated that it incurred a direct injury or that the FTB owed Alcan some independent duty. Alcan Aluminium Ltd. v. Franchise Tax Bd., 558 F.Supp. 624, 628-29 (S.D.N.Y.), aff'd mem., 742 F.2d 1430 (2d Cir.1983), cert. denied, 464 U.S. 1041, 104 S.Ct. 705, 79 L.Ed.2d 170 (1984) (hereinafter "Alcan I ").[9] The district court rejected Alcan's claim that the unconstitutional taxation of an "instrumentality of foreign commerce" in its control constituted a direct injury sufficient to confer standing. Alcan I, 558 F.Supp. at 629.
 
 
 17
 There may well be some merit to the discussions of compliance costs and the double taxation of income in these decisions insofar as these factors, in themselves, were deemed insufficient to constitute direct injuries to the parent companies. The information demands of which Alcan and Imperial complain were presented, as the district court pointed out, to Alcancorp and Americas, not to their foreign parents. Mem. op. at 10. Alcan and Imperial may find it in their interest to expend the considerable sums that they say will be required to produce the worldwide figures for the unitary enterprises that California has requested from their subsidiaries. Or they may find it more advantageous to accept the penalties that California will impose on its subsidiaries for failing to produce the figures. In either event, one could view the information demands as affecting Alcan and Imperial by reducing the profitability of their California operations, net of the administrative costs that these operations impose on the worldwide enterprises. By possible analogy if California enacted environmental or worker safety regulations requiring corporate taxpayers to produce costly information obtainable only through their foreign parents, it would be questionable whether foreign parents would have independent standing to challenge those regulations (at least so long as there was no indication that the regulations were not a mere pretext for raising costs of foreign-owned enterprises). Of course, it is entirely possible, though Alcan and Imperial have made no such claim here, that some parent companies' accounting systems attribute some of the costs of complying with unitary tax systems (or with environmental regulations) to foreign affiliates. But the nominal incidence of compliance costs under a company's own accounting system would not, in itself, normally be determinative of "direct" injury. The compliance costs can be viewed, in principle, as an increase in the overhead of the California operations; under that view, the foreign parents incur harm as shareholders in an enterprise faced with increased costs. See EMI Ltd., 738 F.2d at 997; Shell Petroleum, N.V., 709 F.2d at 595-96; see also Alcan I, 558 F.Supp. at 628-29 & n. 9.
 
 
 18
 Somewhat similar considerations may apply to the double taxation claim, although only as that claim is narrowly construed. Alcan and Imperial point out that California's unitary tax scheme is inconsistent with the transactional approach employed by most if not all foreign nations (as well as by the United States government), which allocates profits among affiliated operations by estimating the distribution of profits that would result from arm's length transactions. Alcan and Imperial contend that California's taxation of corporate income, on which foreign affiliates must pay taxes to their host governments under a transactional tax system, directly injures the foreign parents. But it is possible to view these taxes, like compliance costs, simply as added costs for the domestic subsidiary, experienced by the foreign parent as a decline in the after-tax profits of its California operations. See EMI Ltd., 738 F.2d at 996 (parent's "only real connection to the live controversy is in its status as majority shareholder"); Shell Petroleum, N.V., 709 F.2d at 595 ("[unitary] method of taxation ... does not injure [parent] directly or independently of the corporation").
 
 
 19
 However, the arguments that Alcan and Imperial incur no direct and independent injury from costs plausibly viewed as burdens on their subsidiaries remains persuasive only so long as the relationship between parents and subsidiaries is viewed narrowly, focusing exclusively on the parents' status as shareholders. It is indisputable that, but for their ownership of stock in corporations that operate in California, Alcan and Imperial would have no complaint about either compliance costs or double taxation. This line of argument, however, ignores a second important feature of the relationship between the foreign parents and their domestic subsidiaries: the subsidiaries are owned as instrumentalities of the foreign commerce of their parents. Foreign companies seeking to sell or purchase products or services in California choose between conducting business through dealings with American subsidiaries or through contracts with unrelated companies. Plaintiffs allege that for many enterprises subject to the unitary tax, the earnings of operations in California, computed under the arm's length transaction approach, are lower in relation to labor costs, capital assets and sales than are the similarly computed earnings of related operations in countries other than the United States. These companies will show a higher taxable income in California under the unitary tax scheme than they would if they engaged in precisely the same foreign commerce through arm's length contracts with unaffiliated companies. From the perspective of the foreign parent, therefore, the unitary tax diminishes the attractiveness of owning American subsidiaries in comparison with entering into contracts with independent companies as a means of engaging in foreign commerce. The potential for the unitary tax to penalize foreign ownership of American assets distinguishes the unitary tax from environmental or safety regulation that might cause comparable increases in the cost of doing business in California, but would presumably affect foreign and domestically owned operations fairly equally. It is the incidence of the unitary tax, its potential to disfavor a particular mode of foreign participation in the American economy, rather than the magnitude of the costs it imposes that provides the strongest argument for standing.[10]
 
 
 20
 Viewed in these terms, Alcan's and Imperial's injuries are direct and independent of the injury to their subsidiaries and standing should follow. To the extent that California's franchise tax burdens foreign companies' decisions to conduct business through subsidiaries operating in California, it threatens to offend this country's trading partners, many of whom must deal with conflicting internal views on the proper role of American investment in their economies, and to elicit retaliatory measures. Concern about precisely this type of foreign response to states' taxation of foreign interests has led the Supreme Court to find stricter limits on state taxes in the foreign commerce clause than in the interstate commerce clause. Japan Line, 441 U.S. at 444-45, 99 S.Ct. at 1819-20. The record in this case contains numerous indications that foreign governments view California's and other states' sharp departures from the international norm of taxing corporate income based on transactional allocations of income as a source of serious injury to multinationals located within their borders and a threat to commercial relations with the United States.[11] To be sure, burdening the use of California subsidiaries as an instrumentality of foreign commerce does not necessarily harm Alcan and Imperial exclusively. Alcancorp and Americas may incur parallel injuries by virtue of their participation in the same foreign commerce. But the choices about the manner in which international trade is to be conducted are primarily the parents' choices. To dismiss the injury to the foreign parents caused by the distortion of these choices as indirect and derivative is to expand the shareholder standing rule in an area where its underpinnings are weakest. While we might save some federal courts' resources by confining foreign parents to their subsidiaries' remedies in state tribunals, to achieve these marginal savings we would have to overlook the real sense in which California's franchise tax directly and independently injures Alcan and Imperial. It is important that these injuries, which the FTB would have us label indirect under an expansive view of the shareholder standing bar, have fueled a simmering trade controversy which has raised concerns about foreign retaliation and the country's ability to speak with one voice on matters of foreign commerce--concerns that are central to the purposes of the foreign commerce clause.[12]
 
 B.
 
 21
 The FTB also asserts that Alcan and Imperial are barred from federal court by the principles of comity that have traditionally deterred federal courts from interfering with state revenues. These principles were partially codified in the Tax Injunction Act, which prohibits district courts from enjoining, suspending or restraining state taxes "where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. Sec. 1341 (1982). But that Act is inapplicable here. The Act has been interpreted broadly, in light of Congress' intent "to prevent federal-court interference with the assessment and collection of state taxes," to bar declaratory as well as injunctive relief for plaintiffs with adequate state remedies. California v. Grace Brethren Church, 457 U.S. 393, 411, 102 S.Ct. 2498, 2509, 73 L.Ed.2d 93 (1982). The Court has also adopted a lenient construction of the "plain, speedy and efficient" proviso. Id. at 412-13, 102 S.Ct. at 2510. Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 512-14, 101 S.Ct. 1221, 1228-30, 67 L.Ed.2d 464 (1981). However, the Act has not been construed so broadly as to bar a nontaxpayer (like the parent companies involved here) who lacks a remedy in state court from bringing suit in federal court on the ground that an affiliated taxpayer possesses adequate state court remedies. The FTB concedes that California's administrative and judicial remedies are available only to the taxpaying subsidiaries and not to their parents. Thus, the Tax Injunction Act does not, by its terms, undermine Alcan's and Imperial's entitlement " 'to a judicial remedy in which they can participate as a party.' " Alcan II, 724 F.2d at 1297 (quoting Capitol Indus.-EMI, Inc. v. Bennett, 681 F.2d 1107, 1119 (9th Cir.), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 655 (1982)).
 
 
 22
 The inapplicability of the Tax Injunction Act, however, does not settle the issue. The Act left intact federal courts' "discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states." Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 298, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407 (1943). In some circumstances, this discretion, guided by considerations of comity and federalism, may be exercised to bar suits against state tax assessments to which the Tax Injunction Act is inapplicable. See Fair Assessment in Real Estate Ass'n Inc. v. McNary, 454 U.S. 100, 110-13, 102 S.Ct. 177, 183-84, 70 L.Ed.2d 271 (1981) (suit for money damages under 42 U.S.C. section 1983); Great Lakes, 319 U.S. at 298-99, 63 S.Ct. at 1073 (suit for declaratory judgment);[13] see also Colorado River, 424 U.S. at 816, 96 S.Ct. at 1245 (aversion to interference with state revenues represents one of few, limited grounds for federal abstention); cf. Burford v. Sun Oil Co., 319 U.S. 315, 332-34, 63 S.Ct. 1098, 1106-08, 87 L.Ed. 1424 (1943) (abstention from request to enjoin order of regulatory commission where suit "involves basic problems of [state] policy"). In Alcan II, we held that "the principle of comity militates in favor of a stringent standard of justiciability in cases that threaten to interfere with state taxes." 724 F.2d at 1298. Justiciability in that case turned on a ripeness question: whether the costs to a foreign parent of producing the information required for a unitary tax audit, before the unitary tax in question had even been held applicable, were "sufficient to overcome the prudential considerations of comity." Id. at 1299. While we held that the controversy was not yet ripe, we declined to address whether the same prudential concerns would deprive the parent corporation of standing in the event that the audit produced a determination that the unitary tax applied. Id.
 
 
 23
 We hold that comity and federalism, weighty as these concerns are where federal courts pass on the constitutionality of state tax legislation, cannot justify withholding federal jurisdiction from a party with no cause of action in state court to redress its own direct and independent injury. This is especially true where important, and apparently pressing, considerations of international comity as well as comity within our own federal system are at stake. Neither Great Lakes nor McNary, in which the Supreme Court invoked equitable abstention to avoid federal court interference with state revenue sources, turned aside parties who could not themselves sue in state court.[14] It is also significant that California presumably possesses a ready remedy for unwanted federal intrusion. To eliminate federal court jurisdiction over disputes of this nature, the state need only provide foreign parent companies with a "plain, speedy and efficient" remedy of their own in state court. See Capitol Indust.-EMI, 681 F.2d at 1119 n. 32; Alcan Aluminium, 539 F.Supp. at 516 n. 9. With such effective means of self-help for the state so near at hand, we cannot conclude that comity requires us to deny plaintiffs the opportunity to appear as named parties to litigate their constitutional claims.
 
 IV.
 
 24
 We find that Alcan and Imperial, owners of controlling interests in American subsidiaries that function as instrumentalities of their foreign commerce, have alleged injuries resulting from California's franchise tax that are sufficiently direct and independent of the injuries to their subsidiaries to confer standing. We further find that the foreign parent companies, which have no standing in state court, cannot be barred from federal court on the strength of the principles of comity and federalism that have sometimes justified abstention from disputes about state taxes pending before state tribunals. We therefore reverse and remand for further proceedings.
 
 
 25
 REVERSED AND REMANDED.
 
 
 
 *
 This opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing in banc because of the arguable conflict with the decisions of the Ninth Circuit in EMI Ltd. v. Bennett, 738 F.2d 994 (9th Cir.1984) and Shell Petroleum, N.V. v. Graves, 709 F.2d 593 (9th Cir.1983)
 
 
 [1]
 When Alcan initiated this action for declaratory judgment in August 1984, Alcancorp was directly owned by Alcan Aluminium of Canada, Ltd., which was in turn owned by Alcan Aluminium Limited. A subsequent corporate reorganization renamed Alcan Aluminium of Canada, Limited; it is now called Alcan Aluminium Limited. The entity that was called Alcan Aluminium Limited is now Alcan Aluminium Holdings Limited. This change has no bearing on the issues and we follow the parties' sensible convention of using the original name (shortened to "Alcan") for the foreign parent
 
 
 [2]
 The stipulated facts reveal that by the end of 1985, the FTB had computed Americas' taxes under the unitary apportionment method for the years 1972 through 1981, and was completing its audits of Alcancorp's California returns for the years 1965 through 1981. The record does not reveal the current status of Alcancorp's and Americas' state-level challenges
 
 
 [3]
 The Act states that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. Sec. 1341 (1982)
 
 
 [4]
 In its opening brief, Imperial stated that Americas "is not engaged in foreign commerce and cannot raise a claim under the Commerce Clause ... because it has suffered no injury to its foreign commerce." Brief of Plaintiff-Appellant Imperial Chemical Indus. PLC at 14. The FTB's response contested Imperial's idiosyncratic view that Americas could be uninvolved in foreign commerce while Imperial was engaged in foreign commerce by virtue of transactions with Americas. Brief of Appellees at 23. Imperial's response, that "Americas' foreign commerce is minimal," that the tax "does not directly affect Americas' foreign trade" and that Imperial suffers "the greater loss" from any diminution in trade caused by the tax, do not salvage its position. Reply Brief of Plaintiff-Appellant Imperial Chemical Indus. PLC at 13-14. Nor does the non sequitur that Alcan threw into the breach: "[any] burdens on foreign commerce, ... must of necessity be burdens exclusively on Appellant, not its U.S. subsidiary, since those burdens relate exclusively to the inclusion of Appellant and its non-U.S. subsidiary's foreign activities into the California tax base." Reply Brief of Appellant Alcan Aluminium Limited at 7. Appellants were no more successful in their attempts to illuminate their one-way theory of foreign commerce at oral argument
 
 
 [5]
 Justice Brandeis' concurrence in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 342-44, 56 S.Ct. 466, 480-81, 80 L.Ed.2d 688 (1936), relied in part on the rights of shareholder majorities to support his contention that the shareholder plaintiffs lacked standing. Chief Justice Hughes' lead opinion (which, like Justice Brandeis' concurrence, garnered four votes) found standing based on stockholders' allegations that corporate directors' breached a duty to stockholders by failing to oppose illegal government action. Id. at 318-23, 56 S.Ct. at 469-72. Both opinions looked to the purposes for limiting shareholder standing and the particular facts of the case at hand to assess the status of the plaintiffs in that case
 
 
 [6]
 Colorado River does list federal court actions to restrain the collection of state taxes as one of the few categories of cases in which abstention may be appropriate. 424 U.S. at 816, 96 S.Ct. at 1245. We discuss the comity and federalism argument for denying standing in Part II. B. below
 
 
 [7]
 Our research has revealed only two cryptic references to the relationship between shareholder standing rules and the general prudential limits on standing. See Shell Petroleum, N.V. v. Graves, 570 F.Supp. 58, 63 n. 6 (N.D.Cal.) ("The requirement that a shareholder establish injury to rights specifically vested in it individually, distinct from those of the corporation ... might or might not be a particular instance of the more general prudential standing principles quoted above. But in any event, the requirement must be satisfied."), aff'd, 709 F.2d 593 (9th Cir.), cert. denied, 464 U.S. 1012, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983); Note, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U.Chi.L.Rev. 168, 168 n. 5 (1976) (" 'Standing' in the context of derivative actions is not to be confused with its more traditional meaning as defining when an individual can challenge governmental action.")
 
 
 [8]
 Shell also affirmed the district court's alternative holding that Shell's claim would not be ripe until its American subsidiaries had exhausted their remedies before California administrative bodies. 709 F.2d at 596-97. The district court held that even if Shell had not run afoul of the prohibition on shareholder standing, its injury would not be sufficiently certain and immediate to be deemed ripe until its subsidiaries had exhausted their state-level challenges. Shell Petroleum, N.V., 570 F.Supp. at 65-66. The district court predicated this strict ripeness requirement on the comity and federalism concerns that gave rise to the Tax Injunction Act and the Supreme Court's continuing recognition of limits on its equity powers even where the Act is inapplicable. Id. at 66. We discuss these matters further below
 
 
 [9]
 An earlier district court decision in Alcan I stayed federal court proceedings, including resolution of the standing issue, pending resolution of Alcan's challenges before state administrative bodies and courts. Alcan Aluminium Ltd. v. Franchise Tax Bd., 539 F.Supp. 512, 516 (S.D.N.Y.1982)
 Because Alcan lost on standing grounds in Alcan I, one might have expected the FTB to pursue a collateral estoppel defense in this action. See Planned Parenthood Ass'n v. Kempiners, 700 F.2d 1115, 1138 (7th Cir.1983). Indeed, the FTB did move to dismiss Alcan's complaint on collateral estoppel grounds in the district court, but its motion was denied. The FTB's cross-motion for summary judgment requested reconsideration of collateral estoppel as an alternative basis for dismissing Alcan's suit, but the district court did not discuss this argument.
 On appeal, the FTB virtually ignores this issue. It characterizes Alcan I first as "[a]n action similar to the present one," Brief of Appellees at 11 n. 5, and later as a case that "alleged grounds for relief ... substantially identical to those asserted here," id. at 29. Appellees' only reference to collateral estoppel appears in a footnote discussing the fate of the collateral estoppel claim in the district court. This is notably less than the presentation of legal authority and facts about the two cases that would be required for us to address the collateral estoppel argument on appeal. See Bonds v. Coca-Cola Co., 806 F.2d 1324 (7th Cir.1986); Manbourne Inc. v. Conrad, 796 F.2d 884, 888, 890 n. 6 (7th Cir.1986).
 
 
 [10]
 The tax burden on companies subject to California's franchise tax will depend, of course, on the tax rate as well as on the proportion of worldwide earnings attributed to California's operations. A state that applies a high tax rate to earnings computed according to the arm's length transaction method can depress after-tax earnings available to a foreign parent more than a state that applies a lower rate to the unitary revenues. See Container Corp., 463 U.S. at 195, 103 S.Ct. at 2956. However, a unitary tax system has the potential to shift a higher proportion of the corporate tax burden onto companies that are affiliated with foreign operations. It is this possibility that implicates the concerns about foreign retaliation that have guided the court's interpretation of the foreign commerce clause. See Japan Line, 441 U.S. at 456, 99 S.Ct. at 1825; see also Container Corp., 463 U.S. at 189 n. 26, 195 n. 32, 103 S.Ct. at 2952-53 n. 26, 2956 n. 32 (noting possibility that application of unitary tax to domestic subsidiaries of foreign companies may offend trading partners); cf. Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 107 S.Ct. 1026, 1034-35, 94 L.Ed.2d 92 (1987). Evaluation of the constitutional significance of this threat in the particular circumstances presented by California's unitary tax must await the district court's assessment of the merits of this appeal. We decide only that the potential for constitutionally significant offense is sufficient to create standing
 
 
 [11]
 See, e.g., United Kingdom Finance Act of 1985, New Clause 27 (authorizing Treasury of United Kingdom, subject to parliamentary review, to withdraw United Kingdom tax credit from United States companies with substantial operations in unitary tax states), reprinted in Appendix to the Brief of Plaintiff-Appellant Imperial Chemical Indus. PLC, Item 8; Brief Amicus Curiae Filed on Behalf of the Member States of the European Communities and the Governments of Australia, Japan and Switzerland, No. 87-2295 at 2 (Aug. 27, 1987) ("This case involves issues of vital importance to the fifteen countries and to their future economic and commercial relations with the U.S.")
 
 
 [12]
 Insofar as the Ninth Circuit's decisions in Shell Petroleum, N.V. and EMI Ltd., may conflict with our holding, we are not persuaded to follow them
 
 
 [13]
 Great Lakes declined to decide whether the Tax Injunction Act applied to suits for declaratory judgment, reasoning that considerations of comity justified the refusal to hear such a suit even if the statute did not literally apply. Subsequently, California v. Grace Brethren Church revisited the issue and expressly held that the Act did not distinguish between suits for declaratory and injunctive relief. 457 U.S. at 408-11, 102 S.Ct. at 2507-09
 
 
 [14]
 In Alcan Aluminium Ltd. v. Franchise Tax Bd., 539 F.Supp. 512, 515-16 (S.D.N.Y.1982), the district court did invoke equitable abstention to stay Alcan's federal suit, despite Alcan's lack of standing in state court. The stay remained in force for nine months before it was superseded by an order dismissing the suit on standing grounds. See Alcan I, 558 F.Supp. 624